**ADVANCED RESOURCES INTERNATIONAL, INCORPORATED, Plaintiff–Appellant,**

v.

**TRI–STAR PETROLEUM COMPANY; James H. Butler, Defendants–Appellees. (Two Cases).**

**Nos. 92–2213, 92–2473.**

United States Court of Appeals, Fourth Circuit.

Argued May 6, 1993.

Decided Sept. 7, 1993.

---

John Paul Kopesky, Hoyle, Morris & Kerr, Philadelphia, PA, argued, for plaintiff-appellant.

John E. Coffey, Hazel & Thomas, P.C., Alexandria, VA, argued (Attison L. Barnes, III, on brief), for defendants-appellees.

Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and BUTZNER, Senior Circuit Judge.

## OPINION

MURNAGHAN, Circuit Judge:

Plaintiff-appellant Advanced Resources Inc. (ARI) brought two actions seeking preliminary and permanent injunctions to enjoin Tri–Star Petroleum Company (Tri–Star) and James H. Butler (Butler) from further distributing or otherwise misusing a report written by ARI and supplied to Tri–Star. ARI claimed that it was not told the true use to which the report would be put, and therefore did not include the appropriate disclaimers concerning the accuracy of the report or the source of the information upon which its analyses were drawn. ARI wrote the report, a reservoir simulation study and financial analysis relating to the recovery of methane gas from a geologic formation in the Comet Ridge area of Queensland, Australia, based upon information supplied by Tri–Star. ARI later became concerned that the information it had been supplied was inaccurate. The report has been used by Tri–Star to raise money for a joint venture to recover methane gas. The injunction is necessary, ARI claims, to ensure that misinformation is not disseminated to investors who are not sophisticated in oil and gas matters, and to prevent injury to ARI's reputation.

ARI commenced the action below against Tri–Star and Butler (Tri–Star's President) by filing both a Motion For a Preliminary Injunction and a Complaint seeking permanent injunctive and declaratory relief.

As the basis for the relief sought, ARI claimed a violation of Section 10(b) of the Securities and Exchange Act of 1934 (SEA), 15 U.S.C. § 78j, and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5; a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125; common law fraud and misrepresentation; and breach of the duty of good faith.

The district court, after a hearing on the Motion for Preliminary Injunction, denied it on the basis that the court did not have personal jurisdiction over Tri–Star and Butler with regard to the Securities Exchange Act and Lanham Act claims. In addition, the district court concluded that it was unlikely that ARI would succeed on the merits of its claims under the Securities and Exchange Act because ARI was not a purchaser or a seller of securities and therefore lacked standing. It also would not likely succeed under the Lanham Act because ARI and Tri–Star were not "competitors," and therefore the Act did not apply. With respect to ARI's claims under the theory of common law fraud, misrepresentation, and breach of good faith, the district court found that ARI had failed to demonstrate that it would suffer "irreparable harm" if the injunctive relief was not granted.

Tri–Star and Butler filed an answer to ARI's Complaint, thereby waiving their objections with respect to the exercise of personal jurisdiction. They then filed a Motion for Summary Judgment arguing that they were entitled to summary judgment for essentially the same reasons that served as the basis for the district court's denial of ARI's Motion for a Preliminary Injunction; i.e., ARI lacked standing to assert a claim under the SEA, the Lanham Act is inapplicable to ARI's claims because the parties are not competitors, and ARI has not stated a valid claim for fraud or for breach of the covenant of good faith and fair dealing. After a hearing on the Motion, the court granted Tri–Star and Butler summary judgment, entering judgment against ARI on all claims set forth in the Complaint.

We treat herein both ARI's appeal of the Denial of Preliminary Injunction and its appeal of the Grant of Summary Judgment.

### I.

Appellant ARI is a consulting firm with expertise in oil and gas recovery based in Arlington, Virginia. Appellee Tri–Star is a Texas corporation and manager of a joint venture, Australian Petroleum Joint Venture (APJV), formed to explore petroleum prospects in Australia. Butler, Tri–Star's president, is an individual with extensive experience in the oil and gas business. Butler and Tri–Star have been working on a project to extract methane gas in the Comet Ridge area of Queensland, Australia (Comet Ridge Project) for several years.

In April 1991, as part of the development of the Comet Ridge Project, Butler asked

Scott Reeves, who was then a project manager with ICF Resources, a predecessor of ARI, to perform an analysis relating to the recovery of methane gas from a certain geologic formation in the Comet Ridge area. Butler told Reeves that he was looking for a maximum of four potential partners in the Comet Ridge Project, and intended to solicit those who had worked with him on oil and gas projects in the past. It was Reeves' understanding that any limited number of entities who might see his report would be sophisticated in oil and gas matters and would understand the preparation of an analysis based on untested assumptions as to potential recoverability.

In making his request to Reeves, Butler represented that Tri–Star itself had undertaken a "two-year study" of the Comet Ridge area. According to Reeves, Butler led him to believe that Tri–Star had done the geologic work themselves, that Tri–Star had looked at all wells in the area, and had obtained all relevant information that was available. Thus, Butler was not relying upon ARI for geological expertise.

The purpose of the ARI report, as understood by Reeves, was to furnish an evaluation based on the assumptions provided by Butler which would be helpful in assessing the advisability of undertaking preliminary exploration in the project area. Reeves did not have any understanding that Tri–Star intended to undertake full scale efforts to develop the project area at that time. Reeves ultimately agreed to furnish a reservoir simulation study and a financial analysis of the Comet Ridge Project based on information and assumptions furnished to Reeves by Tri–Star.

During the course of preparing the report, Reeves raised a number of questions about the achievability of some of the assumptions provided by Butler. For example, Butler provided information to Reeves for use in determining gas content, gas saturation, and gas composition in the project area. These variables, like others included in the analysis, could have a significant effect as to projections of recoverable methane. With respect to gas composition, Butler informed Reeves that the gas found in the deposit consisted totally of methane, the valuable hydrocarbon

which it was the goal of the Comet Ridge Project to recover. ARI subsequently learned that certain producing gas wells in the same geologic formation showed high concentrations of carbon dioxide gas, a factor which would materially diminish prospects of recovery.

Reeves raised concerns about other assumptions supplied by Butler. However, Butler, based on Tri–Star's purported examination of the geological data, instructed Reeves as to which assumptions to employ. Since nothing in Reeves' experience suggested that the assumptions were necessarily incorrect, he performed the analysis on the basis set forth by Butler.

On December 16, 1991, the report was issued to Butler containing the technical and financial analysis he had requested. At the time Reeves' report was issued, none of the officers of ARI were aware of its existence. Reeves was not authorized under ARI corporate policy to issue any report which was to be used to raise money. Reeves inadvertently failed to include in the report a disclaimer and disclosure of risk factors which had been included in prior progress reports sent to Butler.

Tri–Star and Butler subsequently issued a lengthy document to prospective joint venturers in the Comet Ridge Project which included Reeves' report and made references to that report, but also contained other statements concerning the project area. For example, the document contains statements extolling the favorable possibilities for methane gas recovery in the area. The Technical Summary issued by Tri–Star states, among other things, that:

> The two-year study by Tri–Star suggests that the Comet Ridge has the best combination of favorable characteristics of any geologic setting in Australia.
>
> . . . .
>
> The coals of the Bandanna Formation and Reids Dome Beds formation exhibit all of the characteristics necessary for high rates of gas production. . . .

None of the information furnished to Reeves, or any other information of which ARI is aware, would allow such a flat statement to

be made with confidence. The Technical Summary specifically asserts that these favorable "characteristics" include high gas content.

Moreover, while a number of the representations made in the Technical Summary do not specifically reference ARI, ARI is referred to in that document in such a manner, it claims, as potentially to confuse those examining the document as to whether ARI endorsed all of the statements contained therein. The Technical Summary drafted by Tri–Star is ambiguous as to the source of the information upon which these favorable predictions are based, and might be taken to suggest that they come from ARI.

ARI has requested that Butler and Tri–Star circulate a corrective disclosure and refrain from using the ARI report further, but Butler and Tri–Star have refused to do so. Butler has stated that Tri–Star will circulate only a more limited disclosure and disclaimer than the one proposed by ARI, and would do so only on the condition that Tri–Star can continue to make use of the report as it and Butler deem appropriate. ARI has specifically informed Butler that Tri–Star is not authorized to make use of Reeves' report to solicit funds from potential investors. Tri–Star has refused to accede to this demand. ARI claims that this indicates that Tri–Star intends to utilize the report in support of efforts to raise money from investors.

### II.

The district court granted Tri–Star summary judgment and denied ARI preliminary injunctive relief on basically the same grounds. At the preliminary hearing, the court, in addition to noting the lack of personal jurisdiction over the defendants, determined that ARI would not likely succeed on the merits of its claims, and that thus under *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir.1977), preliminary injunctive relief had to be denied. *See id.* at 193 (the standard for determining whether

preliminary injunctive relief should issue is the balance of four factors: likelihood that the plaintiff will succeed on the merits; likelihood of irreparable harm to the plaintiff if the injunction is denied; likelihood of harm to the defendant if the requested relief is granted; and the public interest). At the summary judgment hearing, the court reviewed the merits of ARI's claims in greater depth, found them without merit, and granted summary judgment to Tri–Star.

Affirmance of the grant of summary judgment to Tri–Star would affirm *ipso facto* the denial of preliminary injunction. It does not necessarily follow, however, that a reversal of the grant of summary judgment on the basis of one or more of the causes of action compels a grant of a preliminary injunction. Rather, the *Blackwelder* criteria must be examined anew.

■ Applying the *Blackwelder* criteria, we find that the plaintiff has not shown a likelihood of irreparable harm if a preliminary injunction is denied. As the district court pointed out, the harm that ARI fears—that its report will prove to be inaccurate, that investors will rely upon it anyway, and that ARI will be sued for damages—is speculative at best, and may be remedied, should it occur, by an action at law. The harm of damage to ARI's reputation, also claimed by ARI to be an irreparable harm that can only be forestalled by a preliminary injunction, is also speculative. Only if the analysis in the report proves to be incorrect—something that has not been proven—might such reputation damage occur. Accordingly, we decline to reverse the district court's denial of the preliminary injunction.

### III.

We now turn to ARI's claim under § 10(b) and Rule 10b–5 of the SEA, and the district court's determination that ARI had no standing to bring the claim because it is not a purchaser or seller of securities.[1] The Su-

1. Section 10(b) of the Securities Exchange Act provides:
    It shall be unlawful ... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities ex-

change or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as

preme Court decided in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), that only actual purchasers or sellers of securities had standing to bring private damages actions under Rule 10b–5. Tri–Star argued below that the *Blue Chip* standing rule should be applied in the instant case, notwithstanding the fact that plaintiffs here seek injunctive relief rather than money damages. The district court agreed, and in so doing followed the rationale and holding of *Cowin v. Bresler*, 741 F.2d 410 (D.C.Cir.1984). *Cowin* explicitly extended the *Blue Chip* purchaser/seller standing requirement to injunctive actions. A "relaxed standing requirement [for injunctive actions] ... would be contrary to the rationale of section 10(b) and Rule 10b–5 as perceived by the Supreme Court in *Blue Chip*.... Attempting to fashion a different concept of standing for [injunctive] cases [ ] would involve us in distinctions altogether too awkward to be persuasive." *Id.* at 424.

ARI would have us limit the *Blue Chip* standing rule to cases seeking damages and adopt a looser version of the rule for injunctive cases such as we here encounter. It urges the Fourth Circuit, which has not confronted the issue, to reject *Cowin* and follow the lead of some other courts, which have found a limited exception to *Blue Chip*'s statutory requirements and have allowed non-purchasers or non-sellers to bring injunctive actions under 10(b). *See United States v. Newman*, 664 F.2d 12, 17 (2nd Cir.1981) ("a plaintiff need not be a defrauded purchaser or seller in order to sue for injunctive relief under Rule 10b–5") *aff'd*, 722 F.2d 729 (2nd Cir.1983), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983); *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 194 (3rd Cir.1976) (assuming, "for present purposes," that the *Blue Chip*

standing rule does not apply where only injunctive relief is sought to prevent incipient 10b–5 violations); *Davis v. Davis*, 526 F.2d 1286, 1289 (5th Cir.1976) (strict insistence on a purchase or sale is not as critical in a suit for injunctive relief as it is where damages are sought). *But see Head v. Head*, 759 F.2d 1172, 1174 (4th Cir.1985) (adopting the *Blue Chip* standing requirement in the context of a damages case and giving no indication whether or not it would apply equally to actions seeking injunctive relief).

■ We need not today decide whether to endorse the exception to the *Blue Chip* standing rule expressed by the Second, Third, and Fifth circuits. For even if we were to adopt the reasoning in those cases, ARI's assertion of standing would fail. The cases cited by ARI recognize only a very limited exception that applies in narrow circumstances. For example, standing has been granted to a non-purchaser/seller plaintiff where the plaintiff was the government, where the plaintiff was a shareholder whose stock valuation was threatened by deceptive practices, or where the plaintiff was a potential investor or shareholder who would have bought or sold but for the actions of the defendant. *See, e.g., United States v. Newman*, 664 F.2d 12, 17 ("When litigation under this Rule is instituted by the SEC ... or by a United States Attorney ..., the court's concern must be with the scope of the Rule, not plaintiff's standing to sue."); *Davis v. Davis*, 526 F.2d 1286 (5th Cir.1976) (where defendant had not yet made payment to plaintiff for his shares pursuant to a contract, plaintiff was "seller" for purposes of § 10(b) standing to claim injunctive relief even though he had not yet actually sold the stock); *Kahan v. Rosenstiel*, 424 F.2d 161 (3rd Cir.1970) (minority shareholder, though

necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 reads, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or ·of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements, made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10(b)–5.

not purchaser or seller, had standing to seek injunctive relief to stop directors of corporation from misrepresenting and not disclosing material facts in a tender offer because the director's actions, if continued, would deprive him of more favorable disposition of his shares); *Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540 (2nd Cir.1967) (shareholder plaintiffs had standing to claim injunctive relief even though they had not sold their stock where they claimed that defendant corporation was depressing the price of the stock by market manipulation, deceit and fraud).

Any exception to the *Blue Chip* purchaser/seller standing requirements must therefore be limited to three groups of plaintiffs: 1) U.S. Attorneys or the SEC; 2) shareholder plaintiffs who claim that, without injunctive relief to stop the defendants' deceptive and unfair practices, they may in the future suffer monetary loss to their shares; or 3) plaintiffs who can show that, but for the deceptive practices, they would have bought or sold the securities at issue. In the instant case, however, ARI is most certainly not the government. Moreover, ARI can show no financial interest in the securities being offered, and thus cannot show that Tri–Star's misrepresentations to potential Comet Ridge Project investors will threaten the valuation of its own holdings. Finally, ARI is not a potential purchaser or seller of securities, as it does not claim that were it not for Tri–Star's misrepresentations it would buy or sell securities. ARI is merely a company who supplied an engineering report that is being used to raise money for a joint venture.

■ ARI is thus far removed from the limited exception that has been found by some courts to permit non-sellers or non-purchasers to bring injunctive actions. Although we agree that one of the harms ARI seeks to avoid by its action is consistent with the aim of the Securities Exchange Act—to protect potential investors from fraud—a plaintiff, to have standing, must claim an injury personal to itself. For ARI to have standing to claim injunctive relief, it would have to allege that but for Tri–Star's dissemination of the misleading report, it would have bought or sold stock or would have suffered a loss in its current securities holdings. ARI's claim, however, is that unidentified third parties may in the future suffer injuries as a result of reliance on ARI's report—that is, may invest in what may turn out to be a doomed and falsely touted project. To the extent that ARI actually articulates potential injuries to *itself*—damage to its reputation, and the speculative threat of having to defend itself against future buyers or sellers of stock in the Comet Ridge Project—those injuries are simply too far removed, causally, from the sale or purchase of securities, to provide ARI with standing even under a relaxed rule applicable to injunctive relief cases. *See Hunt v. Robinson*, 852 F.2d 786, 787 (4th Cir.1988) (to state a claim under federal securities laws, there must be a causal link between the alleged fraud and the purchase or sale of stock); *Tully v. Mott Supermarkets*, 540 F.2d at 194 (same). Accordingly, the district court's determination that ARI had no standing to bring a claim under the SEA should be affirmed.

## IV.

■ ARI also sought to enjoin Tri–Star and Butler from continuing to use ARI's report by claiming that the use violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125. The Lanham Act "provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985). Section 43(a) of the Lanham Act, which applies to unregistered marks, provides that:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as

to the origin, sponsorship or approval of his or her goods, services or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

Shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

ARI claims that the use of its report in conjunction with Tri–Star's promotional materials for the Comet Ridge Project implies that ARI sponsors or is affiliated with the project. The circulation of the report, ARI contends, constitutes a false endorsement which will harm ARI's good name and reputation, just as one company's use of another's mark, symbol or logo hurts the reputation of the originator of the mark by implying a false association between two products or services. ARI's report and name benefits Tri–Star because it encourages investor confidence, but harms ARI, who does not support Tri–Star's conclusions, and whose reputation depends upon accurate evaluations and analyses.

The typical § 43(a) Lanham Act claim is brought by a plaintiff who is in competition with the defendant, and charges the defendant with using a mark—a brand name, a word, "a slogan, a symbol, a combination of words and symbols, an ornamental feature, a distinctive shape, or something else intended to remind the consumer of the brand"—so similar to that of the plaintiff's that the public may be confused as to the source of the good or service. *Blau Plumbing, Inc. v. S.O.S. Fixit, Inc.,* 781 F.2d 604, 609 (7th Cir.1986). *See also, e.g., Park N' Fly Inc., v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) (Park N' Fly parking lot sued rival airport parking service to enjoin use of the words "Park and Fly" in its name); *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (Mexican restaurant sued competing restaurant for imitating its "trade dress"—the image and overall appearance—in decorating the restaurant); *E. & J. Gallo Winery v. Gallo Cattle Co.,* 955 F.2d 1327 (9th Cir.1992) (winery sued cheese retailer for using the name "Gallo" for cheese and meat); *Banff, Ltd. v. Federated Dept. Stores, Inc.,* 841 F.2d 486 (2nd Cir.1988) (marketer of "Bee Wear" women's clothing sued to enjoin Bloomingdales from using the term "B–Wear" in its stores and on its clothes); *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.,* 743 F.2d 1039 (4th Cir.1984) (manufacturer of plastic ice cream dishes brought action against another manufacturer to enjoin use of similarly designed dishes).

Some courts have expanded the scope of the Act by permitting Lanham Act claims by plaintiffs who are not in commercial competition with the defendant and by giving a broad interpretation to the concept of a "mark." Those courts recognized a § 43(a) injury where the plaintiffs' voices, uniforms, likenesses, published words, or names were used in such a way as to deceive the public into believing that they endorsed, sponsored, or approved of the defendant's product. *See Waits v. Frito–Lay, Inc.,* 978 F.2d 1093, 1107 (9th Cir.1992) ("false endorsement claims, including those premised on the unauthorized imitation of an entertainer's distinctive voice, are cognizable under section 43(a)"); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir.1979) (court recognized claim under § 43(a) where uniform worn by star of X-rated movie was confusingly similar to plaintiff Dallas Cowboy Cheerleaders' trademark uniforms, falsely creating the impression that plaintiffs "sponsored or otherwise approved the use" of the uniform); *Allen v. Men's World Outlet, Inc.,* 679 F.Supp. 360, 368 (S.D.N.Y.1988) (celebrity stated a claim under § 43(a) by showing that advertisement featuring photograph of a look-alike falsely represented that advertised products were associated with him); *Chicago Lawyer, Ltd. v. Forty–Sixth Ward Regular Democratic Organization,* 220 U.S.P.Q. 511, 1982 WL 1283 (N.D.Ill.1982) (plaintiff publisher had cause of action under Lanham Act where the defendant, a democratic precinct captain, reprinted excerpts from plaintiff's publication so as falsely to imply plaintiff's endorsement and sponsorship of defendant's candidates); *Better Business Bureau of Metropolitan Houston, Inc. v. Medical Directors, Inc.,* 681 F.2d 397 (5th Cir.1982) (Better

Business Bureau had Lanham Act claim when weight reduction center used its name in its advertising, falsely implying that its program was endorsed by the Better Business Bureau).

ARI is asking that we go beyond the courts that have found protectable interests in voices, likenesses and images, and interpret § 43(a) to prohibit the use of a commissioned, signed, unaltered report when that use implies an unauthorized and false endorsement.[2] ARI's characterization of Tri-Star's conduct as a § 43(a) violation, however, is awkward in that the "device" here used to imply endorsement—a signed report—is not a mark, or anything even remotely resembling a mark. "The goal of trademark protection is to allow a firm to affix an identifying mark to its product (or service) offering that will, because it is distinctive and no competitor may use a confusingly similar designation, enable the consumer to discover in the least possible amount of time and with the least possible amount of head-scratching whether a particular brand is that firm's brand or a competitor's brand." *Blau Plumbing, Inc.*, 781 F.2d at 609. Here we deal with a commissioned and paid for report, the authorship of which is correctly attributed and the contents of which are unaltered. The report, even if seen by an unintended audience, does not project any false association or confusion in the reader's mind but purports only to be what it in fact is: a commissioned analysis, written by ARI, based on information given to it by Tri-Star. While it is true that the report is coupled with a project summary which draws conclusions about the project's viability more positively than the author of the report supports, and also true that the circulation of the report to a broader and different audience than the writer of the report was led to believe is

threatened, we conclude that such conduct does not state a § 43(a) violation. Tri-Star's use of the report, even if recognized as creating an endorsement that ARI now wishes to deny, cannot be characterized as the deceptive use of a mark. The concept of mark may be broadly defined yet it does not stretch so far as to embrace ARI's report.

## V.

■ ARI also seeks to enjoin Tri-Star and Butler from using its report under the common law theories of fraud and misrepresentation. The elements of a claim for fraud under Virginia law are: (1) a false representation of a material fact, (2) made intentionally and knowingly, (3) with intent to mislead, (4) reliance by the party misled, and (5) resulting damage to the party misled. *Nationwide Mutual Insurance Company v. Hargraves*, 242 Va. 88, 91, 405 S.E.2d 848, 850 (1991).

The district court denied ARI's fraud claim finding that "the report was not induced by any misrepresentation.... The report was induced by the money that was paid for it." The district court's conclusion in that regard was premature. ARI's allegations clearly state facts, which, if proven, would indicate a false representation of a material fact, made knowingly and intentionally to mislead, and reliance upon the representation. However, ARI runs into problems with its fraud claim on the fifth element, the requirement of a showing of resulting damage. "An allegation of fraud in the abstract does not give rise to a cause of action; it must be accompanied by allegation and proof of damages." *The Community Bank v. Mary T. Wright*, 221 Va. 172, 175, 267 S.E.2d 158, 160 (1980).

---

**2.** Tri-Star insists that their circulation of the report was not unauthorized and so cannot constitute a false endorsement. However, on Tri-Star's summary judgment motion we must read the facts as alleged in the light most favorable to ARI. ARI has alleged that it was told by Tri-Star that the report would be shown only to a limited group of people, all of whom would be knowledgeable in the area of oil and gas recovery. ARI also claims that Tri-Star falsely led it to believe that the underlying assumptions given to it for use in its analysis were the result of Tri-

Star's research and study, and were reliable indicators of present conditions in the methane coal bed. Finally, ARI claims that the inclusion of the report in promotional materials recommending the project as a good investment leads readers to believe ARI endorses the project. Accordingly, we assume, without deciding, that the materials circulated by Tri-Star, which include the ARI report, create an illusion of endorsement by ARI that was never bargained for or agreed to by ARI, or which was elicited under false pretense.

ARI insists that because it seeks an injunction it need not show that damage has occurred, but only that damage will occur if the injunction is not issued. The damage that will occur if the injunction is not issued, ARI claims, is injury to its business reputation and goodwill, as well as the loss it will suffer if forced to defend itself against irate investors in the Comet Ridge Project.

We conclude, nevertheless, that ARI's claims of potential damage are entirely too conjectural to support its fraud claim. ARI has named no potential investors who have threatened to sue, nor even any who have seen the report. ARI's claim of a possible injury to its reputation is dependant upon as-of-yet-unproven fears that 1) Tri–Star will continue to circulate the report; 2) a person will invest in the project in reliance of the ARI report; 3) the project will fail; 4) the investor will suffer losses; 5) the investor will sue ARI; and 6) ARI will lose the suit. Only then will ARI have suffered damages as a result of Tri–Star's misrepresentation. But such a series of events leading to damages is simply too speculative and abstract to support the fraud claim. Moreover, even if events unfold as ARI predicts, ARI is not without a remedy at law for any damages it might sustain as a result of having to defend itself against investors. Accordingly, the district court's grant of summary judgment to Tri–Star on the basis that ARI had not met all the elements necessary to establish fraud should be affirmed.

In conclusion, we echo the district court's contention that "the parties have within their grasp a far better range of remedies to suit both of [ ] [their] interests" than does this court, at least at the present stage of events. The district court's grant of summary judgment to Tri–Star is, accordingly,

*AFFIRMED.*

BUTZNER, Senior Circuit Judge, concurring in part and dissenting in part:

I concur in the affirmance of summary judgment with respect to the claim based on Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5.

I respectfully dissent from the affirmance of summary judgment with respect to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), common law fraud, misrepresentation, and breach of the duty of good faith.

*Better Business Bureau v. Medical Directors, Inc.*, 681 F.2d 397 (5th Cir.1982), explains that advertisements that falsely implied that the Better Business Bureau endorsed a weight reduction program were sufficient to raise a claim of "likelihood of confusion" in the minds of the consuming public in violation of Section 43(a) of the Lanham Act. Pointing out that whether a representation presents a likelihood of confusion is a question of fact, the court upheld the grant of a preliminary injunction. 681 F.2d at 400, 403.

ARI's cause of action under the Lanham Act is similar to the claim asserted by the Better Business Bureau. It contends that Tri–Star falsely represents in its advertising that ARI endorses factual misrepresentations concerning the feasibility of the Comet Ridge project.

Whether Tri–Star's misleading brochures raise a likelihood of confusion among potential investors presents a question of fact that is unsuitable for disposition by summary judgment.

I cannot accept Tri–Star's argument that ARI's common law claims fail because of lack of proof of damages. If ARI were seeking monetary damages, concededly they would be too speculative to sustain the claims. But ARI is not seeking monetary damages. It asserts damage to its name and reputation because Tri–Star has falsely attributed to it endorsement of assumptions about the geology of Comet Ridge that lack a factual basis. Fraudulently inflicted harm to a business's reputation is sufficient to justify injunctive relief. *Cf. Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 196–97 (4th Cir.1977).

Because I believe that summary judgment was improvidently granted on the claims that I have mentioned, I would remand the case for further proceedings. If ARI can prove its allegations, it is entitled to injunctive re-

lief lest the public be hoodwinked and ARI's name and reputation besmirched.