**TRUMP HOTELS & CASINO RESORTS, INC., Plaintiff,**

v.

**MIRAGE RESORTS INC., et al., Defendants.**

Civil Action No. 97–1371.

United States District Court, D. New Jersey.

May 1, 1997.

Herbert J. Stern, Stephen M. Greenberg, Stern & Greenberg, Roseland, NJ, for Plaintiff.

Benjamin Clarke, DiCotiis, Fitzpatrick & Gluck, Teaneck, NJ, for Mirage Resorts, Inc.

Peter Verniero, Attorney General of New Jersey, Jeffrey J. Miller, Assistant Attorney General of New Jersey, Richard J. Hughes, Justice Complex, Trenton, NJ, for State of N.J., N.J. Dept. of Transp., N.J. Transp. Trust Fund Authority, John J. Haley, Jr., Steven Hansen.

Theodore W. Geiser, Kevin J. Coakley, Connell, Foley & Geiser, L.L.P., Roseland, NJ, Michael R. Cole, Riker, Danzig, Scherer, Hyland & Perretti, L.L.P., Morristown, NJ, for Casino Reinvestment Development Authority, James B. Kennedy.

George R. Gilmore, Guy P. Ryan, Gilmore & Monahan, Toms River, NJ, South Jersey Transportation Authority and James A. Crawford

ORLOFSKY, District Judge:

Plaintiff, Trump Hotels & Casino Resorts, Inc. ("Trump"), has brought this action against Mirage Resorts Inc. ("Mirage"), the State of New Jersey, various state agencies, and the individuals in charge of those agencies in their official capacities, seeking a declaratory judgment and an injunction barring the construction of a highway and tunnel project, and the development of the Huron North Redevelopment Area (the "H–Tract"), both of which are, or are planned to be located in Atlantic City, New Jersey. The proposed highway, to be known as the Westside–Connector, is intended to link the Atlantic City Expressway with Brigantine Boulevard, and will, if completed, access to, and the development of, the H–Tract.

Based, in part, upon the promised completion of the Westside Connector, defendant, Mirage Resorts, Inc., plans to build a resort complex, including several casinos, on site of the H–Tract. Plaintiff owns three casino hotels in Atlantic City, one of which, Trump's Castle, "is located in the Marina District, in close proximity to the H–Tract." Complaint ¶ 6.

On April 10, Defendants moved to dismiss the complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). On that same day, defendants filed a complaint in the Law Division of the Superior Court of New Jersey, Atlantic County, seeking a declaratory judgment approving the funding mechanism which Trump challenges in this court as violative of the casino gambling amendment to the New Jersey Constitution. Indeed, Trump seeks declaratory relief on this same state constitutional issue in the seventh count of the complaint filed in this court. Because of the importance and novelty of the issues presented, as well as the pendency of a related state court proceeding in which the same state constitutional issue, one of first impression, is raised, this court established an expedited briefing and argument schedule in this case to decide defendants' motion to dismiss.[1]

## I. Summary of Trump's Claims

Plaintiff alleges that the defendant, South Jersey Transportation Authority ("SJTA"), will fund the Westside Connector, in part, through the issuance of bonds "repayable from and collateralized by parking tax proceeds collected for use by the [Casino Reinvestment Development Authority ('CRDA')] from all casinos to be located on the H–Tract." Complaint ¶ 48. In addition, plaintiff alleges that SJTA will issue bonds repayable from the "alternative investment tax obligations of all casinos located on the H–Tract." *Id.*

Trump contends that the contemplated funding scheme for the SJTA bonds violates the New Jersey Constitution, specifically, article IV, section 7, paragraph 2, which governs casino gambling.[2] Plaintiff further alleges that CRDA and SJTA will not disclose this alleged constitutional infirmity to potential purchasers of the bonds. Therefore, plaintiff claims, in the first count of its complaint, that the issuance of the proposed bonds constitutes an impending violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.[3] Plaintiff seeks a permanent injunction barring the sale of these bonds, absent full disclosure of the alleged state constitutional infirmities of the proposed repayment plan.

Trump alleges in the second count of the complaint that the defendants have failed to

1. *See* Transcript of April 10, 1997 telephone conference call.

2. This paragraph provides, in pertinent part:

It shall be lawful for the Legislature to authorize by law the establishment and operation, under regulation and control by the State, of gambling houses or casinos within the boundaries, as heretofore established, of the city of Atlantic City, county of Atlantic, and to license and tax such operations and equipment used in connection therewith. Any law authorizing the establishment and operation of such gambling establishments shall provide for the State revenues derived therefrom to be applied solely for the purpose of providing funding for reductions in property taxes, rental, telephone, gas, electric, and municipal utilities charges of, eligible senior citizens and disabled residents of the State, and for additional or expanded health services or benefits or transportation services or benefits to eligible senior citizens and disabled residents, in accordance with such formulae as the Legislature shall by law provide. The type and number of such casinos or gambling houses and of the gambling games which may be conducted in any such establishment shall be determined by or pursuant to the terms of the law authorizing the establishment and operation thereof.

N.J. Const. art. IV, § 7, ¶ 2, subparagraph D.

3. 17 C.F.R. § 240.10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

comply with the permit requirements of Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, and the regulations promulgated thereunder, in connection with the proposed development of the H-tract and the Westside Connector. Similarly, in the third count, Trump alleges that the defendants have not complied with the permit requirements set forth in the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403, and its associated regulations.

In the fourth count of its complaint, Trump alleges that defendants have not complied with the environmental assessment requirements of the Federal–Aid Highway Act ("FHA"), 23 U.S.C. § 109, and the regulations promulgated thereunder, 23 C.F.R. Part 771. Plaintiff's fifth count claims that the defendants have not met the requirements of the Clean Air Act. 42 U.S.C. § 7506. All federally funded highway projects must comply with the "Transportation Conformity" provisions of 50 C.F.R. Parts 51 and 93 which mandate general compliance with the Regional Transportation and Transportation Improvements Plans adopted pursuant to the Clean Air Act.

On each of the second through fifth counts of the complaint, Trump seeks both a declaratory judgment that compliance with these federal statutes is required, and injunctive relief barring any development until such time as full compliance with these statutes is accomplished.

Trump's final two claims are based on New Jersey law. The sixth count of the complaint alleges violations of the Coastal Area Facility Review Act ("CAFRA"). N.J. Stat. Ann. §§ 13:19–1 to 13:19–21 (West 1991 & Supp. 1997). The seventh and final count of the complaint alleges that the funding scheme for the development of the H–Tract and the construction of the Westside Connector violates the New Jersey Constitution. N.J. Const. art. IV, § 7, ¶ 2. Trump seeks declaratory and injunctive relief under both of its state law causes of action. More specifically, under the final count of the complaint, Trump seeks a declaration that the funding mechanism planned for the SJTA bonds is barred by the New Jersey Constitution.

Defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R.Civ.P. 12(b)(6). Because Trump has not stated a claim for relief under any federal statute or regulation identified in its complaint, those claims will be dismissed. In the interest of comity, this court will decline to exercise supplemental jurisdiction over the plaintiff's state law causes of action. Accordingly, plaintiff's state law claims will be dismissed without prejudice.

## II. Standards Governing Dismissal Under Rule 12(b)(6).

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), this court must accept all well-pleaded allegations of the complaint as true, and construe those allegations in the light most favorable to the plaintiff. *Gomez v. Toledo,* 446 U.S. 635, 636 n. 3, 100 S.Ct. 1920, 1921 n. 3, 64 L.Ed.2d 572 (1980); *Piecknick v. Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir.1994); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). Nevertheless, a complaint should be dismissed if, accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). *See also Gasoline Sales, Inc. v. Aero Oil Co.,* 39 F.3d 70, 71 (3d Cir.1994); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990).

## III. Discussion

### A. The "Purchaser–Seller" Requirement of Rule 10b–5

■ Defendants contend that Trump's claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 must be dismissed for lack of standing. In order to bring an action for a violation of Rule 10b–5, a plaintiff ordinarily must be an actual purchaser or seller of the securities at issue. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (adopting the rule of *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.

1952), in private damages actions under Rule 10b–5). Trump contends that the purchaser-seller rule is inapplicable in suits seeking purely injunctive relief.

The several Circuit Courts of Appeals which have addressed this issue, like the parties before this court, disagree about whether the rule of *Blue Chip Stamps* applies to suits seeking only injunctive relief. Prior to the Supreme Court's decision in *Blue Chip Stamps,* the Third Circuit had carved out an exception to the *Birnbaum* purchaser-seller rule in an action seeking only injunctive relief. *Kahan v. Rosenstiel,* 424 F.2d 161 (3d Cir.1970). In one post-*Blue Chip Stamps* case, the Third Circuit noted that "the 'purchaser-seller' rule of [*Blue Chip Stamps* ] would now preclude the *Kahan* suit." *Sharp v. Coopers and Lybrand,* 649 F.2d 175, 186 n. 15 (3d Cir.1981), *overruled in part, on other grounds, In re Data Access Systems Securities Litigation,* 843 F.2d 1537 (3d Cir.1988) (in banc). In an earlier case, however, a different panel of the Third Circuit had assumed, without deciding, that a narrow exception to the *Birnbaum* purchaser-seller requirement might have survived *Blue Chip Stamps,* "where only injunctive relief is sought to prevent incipient 10b–5 violations." *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 194 (3d Cir.1976) (citing *Thomas v. Duralite Co.,* 524 F.2d 577 (3d Cir.1975)).

The Fifth Circuit has also recognized an exception for purely injunctive actions. *Davis v. Davis,* 526 F.2d 1286, 1289 (5th Cir.1976). However, Judge Bork, writing for a panel of the Court of Appeals for the District of Columbia Circuit, expressly extended the standing requirement of *Blue Chip Stamps* to suits seeking injunctive relief. *Cowin v. Bresler,* 741 F.2d 410 (D.C.Cir.1984). It is not clear that the "narrow exception" discussed, but not applied in *Tully,* even if it survives *Blue Chip Stamps,* is applicable to the facts of this case. *See Tully,* 540 F.2d at 195.

As one authority has observed, "most cases waiving the *Birnbaum* rule have involved shareholder plaintiffs." Jennifer J. Johnson, *Predators Rights: Multiple Remedies for Wall Street Sharks Under the Securities Laws and Rico,* 10 J. Corp. L. 3, 35 (1984). *See, e.g., Granada Investments, Inc. v. DWG Corp.,* 717 F.Supp. 533, 536 (N.D.Ohio 1989) ("The policies embodied in the Exchange Act of eliminating deceptive and unfair practices in securities trading and protecting the public from inaccurate and misleading information are clearly advanced by permitting aggrieved shareholders to bring suits to enjoin wrongful acts."); *Hundahl v. United Benefit Life Insurance Co.,* 465 F.Supp. 1349, 1359 (N.D.Tex.1979) (permitting plaintiff class of minority shareholders to seek injunctive relief).[4]

Trump alleges that, unless an injunction issues, the proposed sale of the SJTA bonds will lead to the construction of the Westside Connector. Complaint ¶ 68. Construction of the highway and tunnel, Trump alleges, will cause harm to Trump, by adversely affecting the environment and local traffic patterns around the Trump hotels, all of which allegedly will result in injury to Trump's business. Complaint ¶¶ 51–60. Notably, Trump does not allege that it plans to purchase or sell any SJTA bonds, if they become available. The absence of an allegation of direct injury is fatal to Trump's claim for relief under § 10(b) and Rule 10b–5.

The Supreme Court has stated that, in addition to the requirements of Article III standing,[5] every complaint of injury must

---

4. At oral argument, plaintiff cited *Foster Wheeler Corp. v. Edelman,* Civ. Action No. 87–4346, 1987 WL 61446 (D.N.J. Dec.9, 1987), as one example in which a court in this district reaffirmed the relaxed standing rule of *Kahan* and *Tully* in a suit seeking only prospective injunctive relief. *Foster Wheeler,* however, is indistinguishable from the cases cited herein that confer standing on a shareholder-plaintiff to bring a derivative suit under § 10b. The fact that the plaintiff in *Foster Wheeler* was the corporation itself, rather than a shareholder, reinforces the narrowness of the *Kahan* exception. *Foster Wheeler* does not expand the class of plaintiffs who may seek injunctive relief under § 10b, as plaintiff suggested at oral argument, to include any person "affected" by the issuance of the securities in question.

5. A particularized injury-in-fact, which is actual or imminent, an injury that is fairly traceable to the conduct complained of, and an injury that can be redressed by a favorable decision, are the minimum requirements of Article III standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–

"fall within 'the zone-of-interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982) (quoting *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)). This prudential standing requirement was originally developed in the context of actions brought under the judicial review provisions of the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701–702. *See Clarke v. Securities Indus. Assoc.,* 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 757 n. 16, 93 L.Ed.2d 757 (1987); *Association of Data Processing,* 397 U.S. 150, 90 S.Ct. 827; *see also* Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.6, at 101 (2d ed.1994). However, the Supreme Court has recognized that a zone of interests standing requirement applies in actions predicated on other statutes. *See Bennett v. Spear,* —— U.S. ——, ——, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997). *See also Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (requiring would-be private party plaintiffs under 18 U.S.C. § 610 to show that they were among "the class for whose *especial* benefit the statute was enacted").

The Supreme Court has recently noted that "the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the 'generous review provisions' of the APA may not do so for other purposes." *Bennett,* —— U.S. at ——, 117 S.Ct. at 1161 (citing *Clarke,* 479 U.S. 388, 400, n. 16, 107 S.Ct. 750, 757 n. 16). Conversely, the zone of interests analysis is not at all applicable when Congress expresses an intent to eliminate such prudential restrictions by including a broad citizen suit provision in the relevant statute. *Id.* at —— ——, 117 S.Ct. at 1162–63 (holding that the citizen suit provision of the Endangered Species Act, which provides that "any person" may bring suit, must be taken at "face value"). Further-

more, Congress only expressly "negates" the zone of interests test when it includes in a statute a citizen suit provision which broadly permits "any person" to bring suit. *Id.* at ——, 117 S.Ct. at 1162 ("Congress legislates against the background of our prudential standing doctrine, which applies unless it is expressly negated."). However, this court need not engage in an analysis of the breadth of the statutory language, as mandated by *Bennett,* because a private right of action under § 10(b) and Rule 10b–5 is entirely judge-made. Appropriately, in the absence of an express Congressional sanction of citizen suits, the federal courts have interpreted the Exchange Act in keeping with judicially imposed limitations on standing.

The *Birnbaum/Blue Chip Stamps* "purchaser-seller" rule is itself derived from the same prudential concerns that animate the zone of interests test. *See Landy v. FDIC,* 486 F.2d 139, 158 (3d Cir.1973) (noting that purchaser seller requirement is "consistent with generally applicable rules of standing."); *Herpich v. Wallace,* 430 F.2d 792, 805–06 (5th Cir.1970) (holding that only purchasers or sellers can incur the injury proscribed by § 10(b) and Rule 10b–5). Clearly, were this court to suspend the purchaser-seller rule for suits seeking only injunctive relief, as plaintiff argues that it should, these prudential concerns would not disappear. Even if plaintiff is correct that the purchaser-seller requirement is inapplicable in an action seeking only injunctive relief, Trump must still satisfy the requirement that its alleged injury fall within the zone of interests sought to be protected by section 10(b) and Rule 10b–5.

In enacting § 10(b), Congress intended "to give the investing public the opportunity to make knowing, intelligent decisions regarding the purchase or sale of securities." *Kahan,* 424 F.2d at 173. The court in *Kahan,* allowed a minority shareholder to sue to enjoin allegedly "deceptive practices which if continued would lead to completed purchases or sales that give rise to a cause of action under § 10(b)." *Id.* The fact that the shareholder plaintiff in *Kahan* alleged that, absent an injunction, he would be the victim of a

61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351       (1992).

securities fraud, is a critical factor in analyzing standing to sue under Rule 10b–5.

In *Initio, Inc. v. Hesse,* 474 F.Supp. 312 (D.Del.1979), a shareholder brought a derivative action, partly under Rule 10b–5, seeking to enjoin an impending stock sale. The court distinguished *Kahan,* noting that Initio did not allege that it was about to "suffer a direct injury as a result of [the alleged] misrepresentations." *Id.* at 321. Rather, Initio alleged that the company was about to perpetrate a securities fraud, and that it might be injured through a decline in the stock price, if lawsuits were brought against the company. *Id.* In the same manner, Trump here asserts that the general public will be defrauded unless an injunction issues. The injury alleged in this case, however, involves harm to the environment and to Trump's businesses arising from the proposed construction of the Westside Connector and the development of the H–Tract. Trump's "harm" is even more remote than that of Initio, because unlike a lawsuit based on fraud, it does not even arise "secondarily" from the fraud itself, but instead, arises from the intervening act of construction of the highway and tunnel, construction which it is alleged will be facilitated by the sale of the bonds.

The Fourth Circuit came to a similar conclusion when faced with a request for an injunction based upon an alleged impending violation of Rule 10b–5. *Advanced Resources Int'l v. Tri–Star Petroleum,* 4 F.3d 327 (4th Cir.1993). Advanced Resources, a consulting firm, sought to prevent the defendant from "distributing or otherwise misusing a report" which it had written concerning recovery of methane gas from certain geologic formations. *Id.* at 329. Advanced Resources urged the court to limit the *Blue Chip Stamps/Birnbaum* rule to cases seeking damages and to "adopt a looser version of the rule for injunctive cases." *Id.* at 332. The court in *Advanced Resources* noted the split in the circuits regarding whether *Blue Chip Stamps* would bar suits for injunctive relief not brought by a purchaser-seller, but elected not to decide whether to endorse such an exception on the facts then before the court. *Id.*

Without specifically mentioning the zone of interests test, the court in *Advanced Resources* ruled that the plaintiff did not fall within the class of persons protected by § 10(b) and Rule 10b–5. After reviewing cases which had allowed an exception to the purchaser-seller rule, the Fourth Circuit explained that:

> Any exception to the *Blue Chip* purchaser/seller standing requirements must be limited to three groups of plaintiffs: 1) U.S. Attorneys or the SEC; 2) shareholder plaintiffs who claim that, without injunctive relief to stop the defendants' deceptive and unfair practices, they may in the future suffer monetary loss to their shares; or 3) plaintiffs who can show that, but for the deceptive practices, they would have bought or sold the securities at issue. In the instant case, however, [Advanced Resources] is most certainly not the government. Moreover, [Advanced Resources] can show no financial interest in the securities being offered, and thus cannot show that Tri–Star's misrepresentations to potential … investors will threaten the valuation of its own holdings. Finally, [Advanced Resources] is not a potential purchaser or seller of securities, as it does not claim that were it not for Tri–Star's misrepresentations it would buy or sell securities. [Advanced Resources] is merely a company who supplied an engineering report that is being used to raise money for a joint venture.

*Id.* at 333. The court concluded that the potential injuries alleged by Advanced Resources, "damage to its reputation, and the speculative threat of having to defend itself against future buyers or sellers of [the stock at issue]" were "simply too far removed, causally, from the sale or purchase of securities, to provide [Advanced Resources] with standing even under a relaxed rule applicable to injunctive relief cases." *Id.* In this case, Trump's allegation of injury is even farther removed from the alleged securities fraud. Trump cannot even allege, as Advanced Resources did, that it may be liable to the defrauded purchasers. Rather, Trump's alleged injury arises entirely out of the proposed construction of the Westside Connec-

tor. Thus, it is not alleged that the incipient "securities fraud" will harm Trump in any way.

Whether viewed as a separate prudential standing requirement or, more generally, as a prerequisite to stating a claim under the securities fraud provisions of section 10b, the result is the same. *See FMC Corp. v. Boesky,* 852 F.2d 981, 996 (7th Cir.1988) (Ripple, J., concurring) (noting that the prudential standing requirement can also be viewed as an issue of "whether the plaintiff has stated a cause of action.") (citing *Eason v. General Motors Acceptance Corp.,* 490 F.2d 654, 658 (7th Cir.1973)). "Regardless of which of these formulations is employed, the essential question remains the same: Do the federal or state statutory provisions upon which each cause of action is predicated afford protection for the plaintiff from the sort of harm alleged in the complaint? To determine whether there is injury that gives rise to a cause of action, a court must analyze the particular provisions of the relevant statutes." *Id.*

In sum, Trump cannot claim that, if purchases or sales of the proposed SJTA bonds are not enjoined, the resulting inconvenience to Trump and loss of prospective business "would give rise to a cause of action under § 10(b)." Such losses would not be cognizable in a securities fraud action under § 10(b) and Rule 10b–5. Accordingly, even if this court affords Trump the benefit of the assumption "that the relaxed standing rule of *Kahan* retains its validity after *Blue Chip Stamps* in appropriate cases where only injunctive relief is sought," Trump's is not an appropriate case in which to apply the exception to the *Birnbaum/Blue Chip* purchaser-seller requirement. *Tully,* 540 F.2d at 194. A plaintiff who seeks to enjoin incipient sales of securities, primarily on the basis that such sales will only indirectly affect its own economic interests, lacks standing to bring an action for injunctive relief under § 10(b) and Rule 10b–5. For this reason, Trump's claim under § 10b and Rule 10b–5 must be dismissed.

### B. The Clean Water Act

■ The Clean Water Act prohibits the "discharge of any pollutant" into the naviga-

ble waters of the United States. 33 U.S.C. § 1311(a). The term "pollutant" includes certain dredged materials and fill which may result from construction activities. *See* 33 U.S.C. § 1362(6). The "navigable waters of the United States" are broadly defined to include all "waters of the United States including the territorial seas." 33 U.S.C. § 1362(7). These waters, in turn, have been defined by regulation to include "wetlands adjacent to waters." 40 C.F.R. § 230.3(s)(7). "The term 'wetlands' means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas." 40 C.F.R. § 230.3(t). Trump alleges that the "H–Tract consists primarily of wetlands." Complaint ¶ 73.

Defendants move to dismiss plaintiff's claim under the Clean Water Act, because Trump has not complied with the statutory notice requirements of the Act. Section 505 of the CWA states that:

> Except as provided in subsection (b) of this section . . . , any citizen may commence a civil action on his own behalf—
>
> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.

33 U.S.C. § 1365(a)(1). The exception contained in subsection (b) provides that:

> No action may be commenced -
>
> (1) under subsection (a)(1) of this section -
>
> (A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii)

to any alleged violator of the standard, limitation, or order.

33 U.S.C. § 1365(b)(1)(A)

Interpreting nearly identical language contained in the notice provisions of the Resource Conservation and Recovery Act ("RCRA"),[6] the Supreme Court stated that the statute's meaning "could not be clearer" and held that "compliance with the 60–day notice provision is a mandatory, not optional, condition precedent for suit." *Hallstrom v. Tillamook County*, 493 U.S. 20, 26, 110 S.Ct. 304, 308–09, 107 L.Ed.2d 237 (1989). The Court went on to hold that when a plaintiff fails to conform to the 60–day notice requirement of RCRA's citizen suit provision, "the district court must dismiss the action as barred by the terms of the statute." *Id.* at 33, 110 S.Ct. at 312.

There is no meaningful distinction which can be drawn between the notice provisions of RCRA and the notice provision of the Clean Water Act. *See Public Interest Research Group of New Jersey, Inc. v. Windall*, 51 F.3d 1179, 1189 n. 15 (3d Cir.1995) (citing *Hallstrom*, 493 U.S. at 31, 110 S.Ct. at 311, for the proposition that the notice provision of the CWA is a jurisdictional prerequisite). *See also National Envtl. Found. v. ABC Rail Corp.*, 926 F.2d 1096 (11th Cir.1991) (Powell, J., sitting by designation) (applying *Hallstrom* to the notice provision of the Clean Water Act). Trump has not alleged that he has complied with the notice provisions of the CWA. Accordingly, Trump's claim based upon the defendants' alleged failure to comply with the CWA must be dismissed.

### C. The Rivers and Harbors Appropriation Act of 1899

Defendants move to dismiss the third count of plaintiff's complaint, which is based upon the defendants' alleged failure to comply with Section 10 of the Rivers and Harbors Appropriation Act of 1899, which provides:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

33 U.S.C. § 403. Trump alleges that the defendants have not secured the authorization of the Secretary of the Army or the Corps of Engineers.

■ In *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981), the Supreme Court held that § 10 of the Rivers and Harbors Appropriations Act does not provide a private right of action to challenge the construction of an unpermitted structure in the navigable waters of the United States. Accordingly, Trump's claim based upon an alleged violation of the permitting requirements of the Rivers and Harbors Appropriations Act of 1899 must be dismissed.

### D. The Federal–Aid Highway Act

■ Trump alleges that, absent an injunction, defendants will violate the Federal–Aid Highway Act ("FHA"), 23 U.S.C. §§ 101–161.

---

**6.** The relevant subsection provides:

No action may be commenced under paragraph (a)(1)(A) of this section -

(A) prior to sixty days after the plaintiff has given notice of the violation to -

(i) the Administrator [of the EPA];

(ii) the State in which the alleged violation occurs; and

(iii) to any alleged violator of such permit, standard, regulation, condition, requirement, or order....

42 U.S.C. § 6972(b)(1)(A).

Specifically, plaintiff cites § 109 of the Act, which establishes standards for federally funded highway projects, and to the regulations promulgated pursuant to § 315 of the Act, especially Section 771.113 of Title 23 of the Code of Federal Regulations, which provides:

> The Administration in cooperation with the applicant will perform the work necessary to complete a [Finding of No Significant Impact] or an [Environmental Impact Statement] and comply with other related environmental laws and regulations to the maximum extent possible during the [National Environmental Policy Act] process. This work includes environmental studies, related engineering studies, agency coordination and public involvement. However, final design activities, property acquisition (with the exception of hardship and protective buying, as defined in § 771.117(d)), purchase of construction materials or rolling stock, or project construction shall not proceed until the following have been completed:
>
> > (1) (i) The action has been classified as a categorical exclusion (CE), or
> >
> > (ii) A [Finding of No Significant Impact] has been approved, or
> >
> > (iii) A final [Environmental Impact Statement] has been approved and available for the prescribed period of time and a record of decision has been signed;
> >
> > (2) For actions proposed for [Federal Highway Administration] funding, the [Federal Highway Administration] Division Administrator has received and accepted the certifications and any required public hearing transcripts required by § 23 U.S.C. 128;
> >
> > (3) For activities proposed for [Federal Highway Administration] funding, the programming requirements of 23 C.F.R. Part 450, Subpart B, and 23 C.F.R. Part 630, Subpart A, have been met.

23 C.F.R. § 771.113(a). Trump alleges, *inter alia,* that no Environmental Impact Statement or Finding of No Significant Impact

has been approved with regard to the Westside Connector. Complaint ¶ 90.

Trump asserts, "on information and belief," that "the Westside Connector is a federally funded highway project." Complaint ¶ 88. Defendants contend that no federal funds will be included in the proposed budget for the Westside Connector. Defendants' Brief at 29. Defendants invite this court's attention to the funding scheme set forth in the Road Development Agreement (the "Road Agreement") entered into on January 10, 1997, between the New Jersey Department of Transportation, the SJTA, and Mirage. This agreement is liberally cited in plaintiff's complaint, although it is not attached to the complaint as an exhibit. Complaint ¶ 46–48.

Trump suggests that the Road Agreement may not be considered by this court, or that it is not "relevant for the purpose of a motion to dismiss for failure to state a claim." Plaintiff's Brief at 37–38. On the contrary, the Road Agreement is directly relevant, and plaintiff's reliance upon it allows this court to consider the Road Agreement on this motion to dismiss. The Third Circuit has held that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). Trump does not dispute the authenticity of the Road Agreement which accompanies defendants' motion to dismiss. *See also In re Donald J. Trump Casino Securities Litigation,* 7 F.3d 357, 368 n. 9 (3d Cir.1993) (Defendants, Donald J. Trump and various Trump entities, prevailed on a motion to dismiss plaintiffs' securities fraud claims by appending a challenged prospectus to their motion to dismiss).[7] Accordingly, it is entirely proper for this court to consider the Road Agreement in the context of this Rule 12(b)(6) motion.

The Road Agreement makes no reference to any federal sources of funding for the Westside Connector. On the contrary, the

---

7. In Trump's argument that this court should not consider the Road Agreement on a motion to dismiss for failure to state a claim, one sees "the engineer hoist with his own petard." William Shakespeare, Hamlet act 3, sc. 4.

Road Agreement sets forth a Preliminary Road Project Budget "which shall not exceed, in the aggregate, $ 330 million." Road Agreement § 1.1, at 10, attached as exhibit A to Affidavit of Roger E. Nutt, dated April 9, 1997. The Road Agreement also sets forth the proposed funding sources, which exclusively include "Developer Road Project Funding Sources" and "State Road Project Funding Sources." *Id.* Developer Road Project Funding Sources "shall mean and be limited to a total of $ 110 million." *Id.* § 1.1, at 7. State Road Project Funding Sources, in turn, "shall mean and be limited to a total of $ 220 million." *Id.* § 1.1, at 11. Thus, these two funding sources fully account for the $ 330 million budget approved for the Westside Connector.

Indeed, plaintiff's complaint further itemizes the amounts and sources of the Road Project Budget. Complaint 48. Plaintiff alleges that ninety-five million dollars will be provided by the New Jersey Transportation Trust Fund Authority, sixty million dollars will be provided by SJTA bonds repayable from Atlantic City Expressway toll revenues, sixty-five million dollars will be provided by SJTA bonds repayable from certain casino parking tax proceeds, fifty-five million dollars will be provided by SJTA bonds repayable from certain casino alternative tax obligations, and fifty-five million dollars will be provided directly by Mirage. *Id.* The sum of these contributions is exactly $ 330 million, which is the cap which has been placed upon the budget in the Road Agreement. Therefore, it is puzzling that Trump, in its complaint, introduces this itemization of funding sources, which appear to be all of the funding sources, as those sources "[a]part from federal reimbursement." Complaint ¶ 48. Clearly, Trump recognizes that, at present, there are no federal funding sources identified in the Road Agreement.

The FHA, and the regulations cited by Trump, anticipate that the individual States will designate a particular project for federal funding and will subsequently apply to the Federal Highway Administration for federal funds in support of that project. *See* 23 U.S.C. § 106 ("the State highway department shall submit to the Secretary for his approval as soon as practicable after program approval, such surveys, plans, specifications, and estimates for each proposed project included in an approved program as the Secretary may require.").

Trump does not allege that the State has designated the Westside Connector as a project for which the New Jersey Department of Transportation will seek federal funding, much less that there has been an application for such funding. It is only after the state has made such an application that the Federal Highway Administration, "in cooperation with the applicant," must complete the required Finding of No Significant Impact or Environmental Impact Statement. 23 C.F.R. § 771.113(a). A claim based upon the Federal–Aid Highway Act, therefore, must, at a minimum, allege that an application for federal funding has been made.

This conclusion is fully consonant with the purpose of the FHA. The FHA is essentially a grant of federal funds to support the construction of state roads and highways. The only public interest which could justify a citizen suit under the Act, is in ensuring that federal funds are not misspent.[8] It is critical therefore, that a complaint invoking the FHA allege more than a hypothetical possibility that federal funds may be spent in connection with the project at issue.

Plaintiff contends that, even if the budget for the Westside Connector is capped at $ 330 million, federal funds could form a part of that amount. The Road Agreement calls for ninety-five million dollars of the total funding to be provided by the New Jersey Transportation Trust Fund Authority. The Trust Fund, in turn, is authorized:

> In its own name, in the name of the New Jersey Transit Corporation or in the name

---

8. Defendants have asserted that there is no private right of action for injunctive relief under the FHA. Defendants' Reply Brief at 18 (citing *Daye v. Pennsylvania,* 483 F.2d 294 (3d Cir.1973) (affirming district court's conclusion that FHA creates no private right of action for damages).

Clearly, the FHA contains no express citizen suit provision. However, I need not, and do not intimate an opinion on this issue, because, even assuming such a private right of action exists, Trump fails to state a claim for injunctive relief under the FHA.

of the State, to apply for and receive and accept appropriations or grants of property, money, services or reimbursements for money previously spent and other assistance offered or made available to it by or from any person, government agency, public authority or any public and private entity whatever for any lawful corporate purpose of the authority, including, without limitation, grants, appropriations or reimbursements from the State or federal government with respect to their respective shares under federal aid highway laws of the costs of planning, acquisition, engineering, construction, reconstruction, repair, resurfacing and rehabilitation of public highways or the costs of planning, acquisition, engineering, construction, reconstruction, repair, maintenance and rehabilitation of public transportation projects and other transportation projects in the State and the authority's operating expenses and to apply and negotiate for the same upon such terms and conditions as may be required by any person, government agency, authority or entity or as the authority may determine to be necessary, convenient or desirable.

N.J. Stat. Ann. § 27:1B–6(i) (West Supp. 1997). From this legislative grant of authority, plaintiff concludes that "the funds contributed to the [Westside Connector] project from the Transportation Trust Fund may include, in whole or in part, money that is or will be granted, appropriated or reimbursed by the federal government." Plaintiff's Brief at 38. This conclusion, however, is unwarranted.

The mere fact that the New Jersey Legislature has empowered the Transportation Trust Fund to seek federal funding does not create a case or controversy for this court's resolution. The possibility that New Jersey may, in the future, apply for federal funds to reimburse all or part of the Transportation Trust Fund's projected ninety-five million dollar share of the Westside Connector budget merely means that a dispute concerning compliance with the FHA may arise at some time in the future. At present, no such dispute is ripe for adjudication by this court. According to the Road Agreement, the state and the developer must each approve the *Preliminary* Road Project Budget and secure the necessary funding prior to closing. The state and Mirage may "pursue all appropriate financing sources." Road Agreement § 4.4. If the state chooses to "pursue" federal funding, Trump's FHA claim may ripen into a case or controversy. Before such time, however, this court is barred form considering such a claim by the plain language of Article III of the United States Constitution.

In sum, because plaintiff has not alleged that any federal funds have been sought or approved for the Westside Connector project, the fourth count of the complaint fails to state a claim upon which relief can be granted. Insofar as the complaint alleges that federal funds can or may become available in the future for the Westside Connector project, such a claim is not ripe for adjudication, and is therefore, not within the scope of this court's Article III jurisdiction.

### E. The Clean Air Act

■ Trump alleges that the defendants have failed, or will fail to comply with the Transportation Conformity provisions of the Clean Air Act. Complaint ¶ 96. However, as plaintiff acknowledges in its complaint, these provisions are only applicable to highway projects that receive federal funding. Therefore, this court's conclusion that no federal funds are, at least at present, involved in the Westside Connector project is sufficient to dismiss this claim. There is, nevertheless, an independent basis for dismissal of this claim.

The Clean Air Act, like the Clean Water Act contains a citizen suit provision and limited notice requirements.[9] However, the Clean Air Act only requires a sixty day no-

---

9. The Clean Air Act authorizes citizen suits, as follows:

Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf -

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or

tice period when the plaintiff proceeds under subsections (a)(1) or (a)(2) of section 7604.[10] Trump brings this suit under § 7604(a)(3), which contains no notice requirement.

Assuming federal funding, Trump states a claim under § 7604(a)(3), however, only if the Westside Connector qualifies as a "major emitting facility" within the meaning of the Clean Air Act. A "major emitting facility," or "major stationary source," is defined as "any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant." 42 U.S.C. § 7602(j).[11] While Trump recognizes that the Westside Connector "will not by itself emit significant air pollution," Plaintiff's Brief at 42 n. 6, Trump contends that it will be an "indirect source," which is defined as "a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution." 42 U.S.C. § 7410(a)(5)(C). Trump contends that such an "indirect source" may also be a "major stationary source" or "major emitting facility" within the meaning of the Clean Air Act. I disagree.

The Clean Air Act specifically provides that a state "may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program." 42 U.S.C.

§ 7410(a)(5)(A)(i). Therefore, the choice "whether and how to regulate [indirect sources] is left largely to the states." *Sierra Club v. Larson,* 2 F.3d 462, 467 (1st Cir. 1993). Thus, "[a]lthough indirect sources are not in terms excluded from the definition of stationary sources—the former provision is cast instead as a limitation on EPA authority—the effect of [§ 7410] is to treat indirect sources as a separate category of sources subject to a different legal regime." *Id.* A natural reading of the statute, leads to the conclusion drawn by the First Circuit in *Larson,* that "an indirect source is not to be treated as a stationary source" for purposes of § 7604(a)(3). A "highway" is among the indirect sources specifically enumerated in § 7410(a)(5)(C), and it is not disputed that the Westside Connector is a "highway" within the meaning of the Clean Air Act. Accordingly, even assuming that the Westside Connector will benefit from federal funding, Trump has failed to show that his claim may be brought under subsection (a)(3) of the citizen suit provision of the Clean Air Act. Because subsections (a)(1) and (a)(2) require notice, and Trump has not alleged that he has provided notice, the inquiry is at an end. Trump's fifth count, which is brought under the Clean Air Act, must be dismissed.

### F. *Supplemental Jurisdiction*

■ The Supplemental Jurisdiction statute provides, in relevant part,

> a State with respect to such a standard or limitation,
>     (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator, or
>     (3) against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment) or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.
> 42   U.S.C. § 7604(a).

**10.** The notice requirement of this section provides:

> No action may be commenced -
>     (1) under subsection (a)(1) of this section—
>         (A) prior to 60 days after the plaintiff has given notice of the violation (i) to the Adminis-

> trator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or
>     (B) if the Administrator or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any person may intervene as a matter of right.
>     (2) under subsection (a)(2) of this section prior to 60 days after the plaintiff has given notice of such action to the Administrator, . . . .
> 42   U.S.C. § 7604(b).

**11.** As the Supreme Court has noted, "major emitting facility" and "major stationary source" are synonyms. *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 860, 104 S.Ct. 2778, 2790, 81 L.Ed.2d 694 (1984). Although the statute sets forth the meaning of the word "major," in terms of quantity of pollutants, "it sheds virtually no light on the meaning of the term 'stationary source.'" *Id.*

The district courts may decline to exercise supplemental jurisdiction over a claim . . . if -

(1) the claim raises a novel or complex issue of state law.

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in compelling circumstances, there are other reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

This subsection arguably presents more than one possible justification for this court to decline to exercise jurisdiction over Trump's state law claims. Nevertheless, having decided that Trump has failed to state any federal claim upon which relief can be granted, this court must determine whether to retain supplemental jurisdiction over Trump's state law causes of action contained in the sixth and seventh counts of its complaint pursuant to § 1367(c)(3).

Supplemental jurisdiction is a doctrine of discretion, not of right. *See Borough of West Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir.1995) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966)). In deciding whether to dismiss pendent state law claims, a district court must take into account principles of judicial economy, convenience, fairness and comity. *Shanaghan v. Cahill,* 58 F.3d 106, 110 (4th Cir.1995) (citing *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988)); *Wright v. Associated Ins. Companies Inc.,* 29 F.3d 1244, 1251 (7th Cir.1994) (same). The most significant of these concerns in this case is comity. Considerations of fairness and judicial economy are simply

not compelling in this instance. This lawsuit was only recently filed and has not proceeded beyond the filing of preliminary jurisdictional motions. No discovery has been conducted, nor has a trial date been scheduled.

Principles of federalism implicit in the United States Constitution dictate that, whenever possible, state courts should be given the opportunity to interpret their state constitutions.[12] "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139. *See also Doe v. Sundquist,* 106 F.3d 702, 708 (6th Cir.1997) (declining supplemental jurisdiction, in part, out of "respect for the right of a state court system to construe that state's own constitution").

Only the New Jersey Supreme Court can give an authoritative construction of the New Jersey Constitution. This court may not certify a novel question of state law, such as is presented in this case, to that tribunal, because New Jersey has not adopted a certification procedure.[13] Clearly, the interests of justice, as well as the interests of comity, will best be served by allowing the Superior Court of New Jersey to construe the New Jersey Constitution in the first instance. Accordingly, Trump's state law claims will be dismissed without prejudice.

## IV. Conclusion

For the reasons stated above, defendants' motion to dismiss this action will be granted. The court will enter an appropriate order.

### ORDER

This matter having come before the Court on May 1, 1997, on Defendants' Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6),

---

12. Indeed, simultaneous with the filing of defendants' motion to dismiss, the State and CRDA commenced an action in the Law Division of the Superior Court of New Jersey, Atlantic County, at Docket Number ATL–1373–97, in which they seek a declaratory judgment approving the funding mechanism which Trump assails in this case as unconstitutional under the New Jersey Constitution.

13. *See Hakimoglu v. Trump Taj Mahal Assoc.,* 70 F.3d 291, 293 (3d Cir.1995); *see id.* part V, at 302–04 (Becker, J., dissenting, joined, in part V only, by Nygaard and Alito, JJ.) (describing the overwhelming satisfaction of federal judges with state certification procedures where they exist and urging New Jersey to adopt certification). *See also Hulmes v. Honda Motor Co.,* 924 F.Supp. 673, 678 (D.N.J.1996).

Herbert J. Stern, Esq., and Stephen M. Greenberg, Esq., of Stern & Greenberg, appearing on behalf of the Plaintiff, and, Benjamin Clarke, Esq., of DiCotiis, Fitzpatrick & Gluck, appearing on behalf of Defendant, Mirage Resorts, Inc., and Jeffrey J. Miller, Esq., Assistant Attorney General of New Jersey, appearing on behalf of Defendants, the State of New Jersey, New Jersey Department of Transportation, New Jersey Transportation Trust Fund Authority, John J. Haley, Jr. and Steven Hansen, and Theodore W. Geiser, Esq. and Kevin J. Coakley, Esq., of Connell, Foley & Geiser, L.L.P., appearing on behalf of Defendants, Casino Reinvestment Development Authority and James B. Kennedy, and Guy P. Ryan, Esq., of Gilmore & Monahan, appearing on behalf of Defendants, South Jersey Transportation Authority and James A. Crawford; and,

The Court having considered the motion, the briefs, and the Road Agreement filed in support of the motion, and the brief filed in opposition to the motion, as well as the oral argument of counsel, for the reasons set forth in this Court's Opinion filed currently with this Order;

It is, on this 1st day of May, 1997, ORDERED that Defendants' motion is GRANTED; and,

1. The First through Fifth Counts of plaintiff's Complaint are dismissed for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6);

2. The Sixth and Seventh Counts of plaintiff's Complaint are dismissed without prejudice, pursuant to 28 U.S.C. § 1367(c)(3).