John TULLY et al. (Plaintiffs in D.C.),

v.

MOTT SUPERMARKETS, INC., a corporation of the State of Connecticut, et al., (Defendants in D.C.), Appellants.

Thomas INFUSINO et al. (Counterclaim Plaintiffs in D.C.),

v.

John TULLY et al. (Counterclaim Defendants in D.C.) (D.C. Civil Action No. 835-71).

No. 75-2253.

United States Court of Appeals, Third Circuit.

Argued March 22, 1976.

Decided Aug. 13, 1976.

Dennis J. Block, Weil, Gotshal & Manges, New York City, and Donald A. Scott, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellants.

Donald A. Robinson, Robinson, Wayne & Greenberg, Newark, N.J., for appellees.

Before SEITZ, Chief Judge, and ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Plaintiffs, several Class A shareholders of Wakefern Food Corp. ("Wakefern"), brought this action against the defendants, 66 Class C shareholders of Wakefern, charging them with violations of § 10(b) of Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, in connection with defendants' purchase of Class A treasury stock of Wakefern, allegedly in violation of an agreement requiring the stock to be offered first for sale to plaintiffs. In addition, the complaint charged defendants with fraud, breach of fiduciary duty and tortious interference with contractual relations in violation of New Jersey law. Plaintiffs sought both monetary relief and an order rescinding the sale of stock by Wakefern, which was not named as a party to this action.[1]

Pursuant to a Pre-Trial Order, the damage issues were reserved for future disposition, and the case was submitted to the district court for resolution without trial, based on all pleadings, depositions, interrogatories and proposed findings submitted by each side. The district court entered judgment in favor of the plaintiffs and ordered, *inter alia,* that the sale of treasury stock to defendants and others be rescinded.[2] The defendants have appealed, raising numerous claims of error.

## I. FACTS

Wakefern was organized in 1946 by a group of small independent grocers in order to provide purchasing, warehousing, and advertising services to its member shareholders, all of whom individually own grocery markets under the Shop-Rite trade name. Initially, the capital structure consisted of one class of stock which was issued to Wakefern's members in proportion to their volume of purchases. In order to enable Wakefern to obtain credit, several of its larger members agreed to personally guarantee payments to vendors. In exchange for their assumption of personal liability, the loan guarantors were issued 1,000 shares of a newly created class of stock—Class A stock—and all members of Wakefern, including the Class A shareholders, received Class B stock in proportion to the volume of their purchases from Wakefern. Traditionally, the Class A shareholders have possessed voting control with respect to Wakefern's board of directors.

In an attempt to remedy the imbalance in voting control, Wakefern's capital structure was altered in 1963. A new class of stock—Class C—was created, with the right to elect 6 of the 18 directors. All non-Class A shareholders exchanged their Class B stock for Class C stock. Class A shareholders retained their Class B stock but were prohibited from acquiring Class C shares.

Although the Class A shareholders retained voting control of Wakefern's board,

---

1. Defendants claimed unsuccessfully at various times in the district court that Wakefern was an indispensable party. They reassert this contention on appeal and also claim that other purchasers of Class A treasury stock were also indispensable parties. In view of our disposition of this case, we need not decide this issue.

2. We have jurisdiction of this appeal under 28 U.S.C. § 1292(a)(1).

prior to 1966 no one group of these shareholders was able to elect more than 5 directors. In early 1966, however, Wakefern's 2 largest Class A shareholders announced their intention to merge. The new corporation resulting from that merger, Supermarkets General Corporation (SGC) would have possessed sufficient Class A stock to elect 9 members of Wakefern's 18 member board. Alarmed by the threat which such concentration of Class A stock posed to Wakefern's continued ability to operate on a quasi-cooperative basis, the 3 non-SGC Class A directors and the 6 Class C directors adopted a board resolution requiring the withdrawal of SGC and the purchase of its stock by Wakefern.

SGC commenced an action in the New Jersey state court to enjoin implementation of that board resolution. Subsequent negotiations between the parties, however, resulted in a settlement agreement whereby the resolution ousting SGC was to be voluntarily withdrawn. In addition, the proposed settlement provided for the elimination of excessive control by the SGC group by increasing the number of directors from 18 to 20—the additional 2 directors to be elected by the Class C shareholders—and by requiring the affirmative vote of 12 directors before any action by the board could be taken. In contemplation of SGC's possible future withdrawal from Wakefern, the proposed settlement also provided that upon the withdrawal of any shareholder accounting for more than 3% of Wakefern's volume of sales, Wakefern would purchase the withdrawing shareholder's capital stock for a purchase price equal to the higher of $100 or book value.

In conjunction with the planned settlement of the SGC lawsuit, the Class A shareholders executed a restrictive stock agreement on April 16, 1966 which purported to require all Class A shareholders who desired to sell their stock at any future time to offer that stock first to other Class A shareholders at $100 per share. The apparent purpose of this agreement was to ensure that voting control would remain in the hands of the Class A shareholders.

Final approval of the settlement agreement was conditioned upon the approval of Wakefern's board of directors, and since various provisions of the settlement called for the amendment of Wakefern's Certificate of Incorporation and by-laws, shareholder approval was also required. The settlement was first submitted to the board of directors which unanimously approved the proposal in the form presented. While it is unclear the extent to which the Class C directors knew of the restrictive stock agreement previously executed by the Class A shareholders, the board resolution approving the settlement specifically referred to "certain restrictions upon the transfer of such Common A stock," and authorized the corporate officers "to execute and deliver such agreement" on behalf of the corporation. As a consequence, the restrictive stock agreement was signed by the President of Wakefern in the following manner:

"Approved and agreed to:
Wakefern Food Corp.
By /s/ Alex Aidekman"

The various amendments to the Certificate of Incorporation and the by-laws which the board had adopted were subsequently ratified at a special meeting of the stockholders. The restrictive right of first refusal agreement among the Class A shareholders, however, was not submitted for general shareholder approval.

Following the successful conclusion of the settlement negotiations and proceedings, SGC announced its intention to withdraw from Wakefern pursuant to the newly enacted by-law which obligated Wakefern to repurchase its capital stock at $100 per share or book value, whichever was higher. SGC owned 666⅔ shares of Class A stock which, by agreement with Wakefern, were repurchased at a price of $108.28 per share, the then book value. This left outstanding 333⅓ shares of Class A stock. The remaining owners of outstanding Class A stock, who had previously possessed sufficient stock ownership to elect 4 of the 12 Class A directors, were now able to elect all 12 Class A directors authorized by Wakefern's Certificate and by-laws. Their exercise of this

voting power continued unchallenged during the next 3 years.

Following the election of directors in May, 1970, 4 of Wakefern's Class C directors met to discuss the increasing control exercised by the Class A shareholders and to consider the possibility of distributing the Class A treasury shares held by Wakefern in order to reduce this control. They were advised by counsel that a desirable method of accomplishing the distribution was through a board resolution calling for the offer of the treasury stock to all shareholders of Wakefern on an equal basis. The remaining Class C directors were subsequently informed that a board resolution to this effect would be introduced at the directors' meeting scheduled for April 8, 1971.

On the morning of April 8, most of the Class C directors met prior to the board meeting. They received a copy of the proposed board resolution and reaffirmed their adherence to the method of distribution contained therein. At the board meeting which followed, the resolution was introduced and adopted by the affirmative vote of 15 directors, notwithstanding the attempt by Wakefern's President to adjourn the meeting and delay the vote on the resolution. In accordance with the terms of the resolution, an offer to purchase 19 shares of the Class A treasury stock at book value was mailed by Wakefern to each of its members, including the Class A shareholders. The terms of the offer required that it be accepted by tendering a check to Wakefern within 10 days.

During the 10 day period in which the offers were outstanding, the 4 Class A shareholders of Wakefern went to Wakefern's offices and, relying on their right of first refusal contract dated April 16, 1966, sought to require the Class A stock held in Wakefern's treasury to be turned over to them. Counsel for the Class C directors expressed his belief that their demand was invalid in view of the board resolution of April 8, 1971. Accordingly, the Class A shareholders' request for the surrender of the treasury shares was denied. Thereaft-

er, the stock was promptly issued pursuant to the terms of the board resolution to those shareholders who timely accepted Wakefern's offer to sell.

Certain Class A shareholders then brought this action against the directors who had voted in favor of the board resolution authorizing the distribution of the Class A treasury shares and the Class C shareholders who participated in the distribution, seeking to rescind the sale and to compel the directors of Wakefern to sell the stock to plaintiffs instead, pursuant to the terms of the April 16, 1966 right of first refusal agreement. The district court characterized the defendants actions as "the culmination of a conspiratorial endeavor to deprive the A holders [plaintiffs herein] of the control that was rightfully theirs by knowingly inducing the corporation to breach the contract among it and the A holders providing the latter with the right of first refusal upon the sale of treasury A stock." Accordingly, the court ordered the cancellation of the sale of stock and declared the stock subject to the 1966 right of first refusal agreement. This appeal followed.

## II.  SECTION 10(b) AND RULE 10b–5 CLAIM

We turn first to defendants' contention that the district court erred in finding their conduct violative of § 10(b) and Rule 10b–5. A threshold issue which we must consider is whether or not plaintiffs possess the requisite standing to bring suit under these provisions. Defendants argue in this regard that plaintiffs lack standing to sue because they were neither purchasers nor sellers of securities, as required by the Supreme Court's recent decision in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Plaintiffs argue that they possess the requisite standing under *Blue Chip Stamps* to maintain this action by virtue of their contractual right to purchase securities set forth in the April 16, 1966 contract and because they were actual purchasers of the Class A treasury stock. In the alternative, plaintiffs contend

that the strict "purchaser-seller" test of *Blue Chip Stamps* is inapplicable in Rule 10b–5 cases such as the present where only equitable relief is sought.

A resolution of the standing issue requires us first to examine the Supreme Court's decision in *Blue Chip Stamps.* There the Court held that a private cause of action for money damages under Rule 10b–5 can be maintained only by a purchaser or seller of the stock in question. Plaintiffs in *Blue Chip Stamps* were disappointed offerees of a registered stock offering held pursuant to the terms of an antitrust consent decree. They alleged that they had been dissuaded from purchasing the offered shares because of their reliance on a false and misleading prospectus. Although plaintiffs were neither actual purchasers nor sellers of securities, they sought to equate their purported right to purchase stock under the consent decree with a contract to purchase securities within the meaning of the 1934 Act.[3] The Supreme Court rejected their contention, finding that they derived no entitlement from the consent decree and did not otherwise possess a contractual right or duty to purchase the stock. As a consequence, the Court concluded that they were neither purchasers nor sellers and hence, lacked standing to sue for violation of Rule 10b–5.

### A. The 1966 Agreement as a Basis for Standing

■ Although mindful of the standing restrictions announced by the Supreme Court in *Blue Chip Stamps,* the district court in the instant case nevertheless determined that the April 1966 restrictive stock agreement among the Class A shareholders was a contract to purchase securities which was binding on Wakefern. The district court therefore concluded that plaintiffs had standing to· sue under Rule 10b–5 as "purchasers" of securities.

The defendants charge that the district court erred in determining that the April 1966 agreement obligated Wakefern to offer its Class A treasury stock to plaintiffs on a first option basis. They interpret the agreement as granting the Class A shareholders a right of first refusal only when Class A stock is sold by other Class A shareholders. The agreement is binding on Wakefern, they assert, only insofar as Wakefern has agreed, as custodian of all stock certificates, to perform certain ministerial duties upon any transfer in stock ownership. Plaintiffs argue, to the contrary, that since Wakefern was "a holder" of Class A stock and a signatory to the agreement, it was bound by the terms of the agreement in the same manner as any other Class A shareholders.

An examination of the language of the agreement itself supports defendants' contention that Wakefern's obligations thereunder were limited to its duties as a registrar and transfer agent. In referring to the various principals to the transaction, the agreement sharply distinguishes between the "parties" on the one hand, and Wakefern on the other. The parties to the agreement, all of whom are individual Class A shareholders, are listed in the initial paragraphs thereto. The agreement goes on to provide that no party shall sell any Class A shares, with exceptions not here relevant unless the stock is first· offered to the other Class A shareholders.

In contrast to the duties of the parties, Wakefern's primary responsibilities are listed in Section VII of the agreement which is entitled "Endorsement and Transfer of Stock Certificates." By that Section, "Wakefern agrees not to transfer any *certificates* of A stock *except such as may be transferred in accordance with the terms and provisions of this Agreement*." (Emphasis added). In addition, Wakefern agrees in Section V of the agreement to send copies of any offer to sell Class A

---

**3.** Section 3(a)(13) of the 1934 Act, 15 U.S.C. § 78c(a)(13), provides:
"The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire."

Section 3(a)(14) of the 1934 Act, 15 U.S.C. § 78c(a)(14), provides:
"The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of."

shares submitted by a party to the agreement, to offeree A shareholders. Unlike the restriction placed upon the *parties* with respect to their sale of Class A stock, no explicit restriction is made on Wakefern's right to acquire or dispose of Class A stock in any manner whatsoever.

Plaintiffs place great emphasis upon Section X(b) of the agreement which provides that any holder of Common A stock may become a party to the agreement by executing the same or by executing a separate document in a specified form. Wakefern's mere signature of the agreement, plaintiffs contend, constituted the requisite execution under this Section which was sufficient to bind Wakefern as a "party." While it is true that Wakefern "approved and agreed to" the agreement, we do not believe that its signature was an executing signature by a holder of Common A stock which was intended to bind Wakefern in the same capacity as the other signatories.

In the first place, Wakefern was not a "holder" of Class A stock at the time it signed the agreement. Rather, Wakefern only became a Class A shareholder upon SGC's subsequent withdrawal and upon its repurchase of SGC's Class A stock in 1968. Its signature, therefore, was not made with the present intention of immediately succeeding to the rights and obligations of the then Class A shareholders. A more likely explanation is that by signing the agreement, Wakefern was merely acknowledging its custodial role as transfer agent in the event of any future change of ownership among Class A shareholders.

The fact that Wakefern did not sign the agreement in the same manner or in the same place as did the parties thereto provides additional support for our conclusion. Whereas each party "executed" the agreement by signing in the right hand margin, Wakefern "approved and agreed to" the contract by signing in the lower left hand margin. That Wakefern signed the agreement at all is probably due to the provision of Section XI which states that the "Agreement shall inure to the benefit of, and be binding upon, Wakefern and the parties" thereto. We do not read this provision, however, as imposing any greater substantive obligations on Wakefern than those expressly contained in the relevant portions of the agreement which outline Wakefern's specific responsibilities thereunder. Hence, although the agreement became "binding" upon Wakefern as a result of its signature, it became binding only with respect to the ministerial transfer functions which Wakefern had promised to perform and not with respect to the substantive right of first refusal obligations agreed to by the Class A shareholders. *See Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 888 (3d Cir. 1975).

Under this construction, it is evident that plaintiffs possessed no entitlement or contractual right to purchase Wakefern's treasury stock on a preferential basis. Hence, the district court erred in finding that the 1966 agreement constituted a contract to purchase securities which conferred standing upon plaintiffs.

### B. Plaintiffs' Purchase of Stock as a Basis for Standing

In addition to their reliance on the April 1966 agreement, plaintiffs also premise standing on the fact that they were actual purchasers of a portion of the Class A treasury stock offered by Wakefern pursuant to the board resolution of April 8, 1971. According to the terms of that resolution, each shareholder of Wakefern, including plaintiffs, was offered 19 shares of Class A stock. Although plaintiffs tendered a sum sufficient to purchase all the shares, in reliance on their rights under the right of first refusal agreement, the directors caused Wakefern's controller to accept only that portion of the money tendered which was necessary for the purchase of 19 shares by each plaintiff. The balance was returned to plaintiffs who, in turn, retendered the money to Wakefern.

The district court did not consider whether plaintiffs' actual stock purchase conferred standing on them to maintain this action, but rather relied exclusively on the 1966 agreement in support of its decision. Indeed, it is unclear whether this claim was

even raised in the district court. The sole mention on this appeal of plaintiffs' purchase of stock as a basis for standing is a passing reference to this claim in plaintiffs' brief. Assuming, however, that this claim was timely raised in the district court, we find it lacking in merit.

The "purchase" or "sale" requirement, derived as it is from the actual language of the 1934 Act which makes unlawful any deceptive or manipulative device employed " 'in connection with the purchase or sale' of any security," contemplates a causal connection between the alleged fraud and the purchase or sale of stock. *See Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128. In the instant case, however, the requisite causal connection is lacking. The fraud which plaintiffs have alleged lies not in the actual sale of stock to them, but rather in the refusal to sell the remaining Class A shares in accordance with the 1966 agreement. To be sure, plaintiffs stress that their 10b–5 claim is based, independent of the contract, on the actions of defendants "in meeting secretly while conspiring to shift voting control from plaintiffs . . . to themselves without a legitimate corporate purpose," and in inducing Wakefern to sell defendants its treasury stock at a fraudulently low price.[4] These alternative bases of 10b–5 liability, however, are deficient in the respect identical to plaintiffs' principal contract claim. The allegations are based, not on injuries suffered as a result of plaintiffs' actual stock purchase, but rather on injuries caused by Wakefern's refusal to sell to plaintiffs and by its sale to defendants. The gravamen of their complaint, therefore, is that they were "deprived" purchasers. We do not believe such allegations are sufficient to confer standing on plaintiffs in the absence of a showing of fraud in connection with their own purchase of securities.

## C. Equitable Relief as a Basis for Standing

Relying on this Court's decision in *Kahan v. Rosenstiel*, 424 F.2d 161 (3d Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), plaintiffs next argue that regardless of their status as purchasers of securities, they possess the requisite standing to maintain this action because they seek only equitable relief in connection with their Rule 10b–5 claims.[5] *Kahan*, a pre-*Blue Chip Stamps* case, held that a private party who is neither a purchaser nor seller but who seeks only injunctive relief as opposed to money damages for an alleged 10b–5 violation, has standing to sue if he can establish a causal connection between the violations alleged and his injury. *Accord, Britt v. Cyril Bath Co.*, 417 F.2d 433 (6th Cir. 1969); *Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540 (2d Cir. 1967). Plaintiffs urge that this exception to the "purchaser-seller" rule survives *Blue Chip Stamps* because the Supreme Court expressly limited its holding in that case to private causes of action for money damages.

We may assume, for present purposes, that the relaxed standing rule of *Kahan* retains its validity after *Blue Chip Stamps* in appropriate cases where only injunctive relief is sought to prevent incipient 10b–5 violations. *See Thomas v. Duralite Co., Inc.*, 524 F.2d 577 (3d Cir. 1975). Nevertheless, we do not believe the instant case is one which fits within the *Kahan* exception.

The rationale of *Kahan* was premised on the policy of the 1934 Act to eliminate deceptive and unfair practices in securities trading and to protect the public from inaccurate and misleading information. We

---

4. Plaintiffs brought this action in their own right, rather than derivatively on behalf of the corporation. Their reliance on our decision in *Pappas v. Moss*, 393 F.2d 865 (3d Cir. 1968), is therefore unfounded.

5. Plaintiffs assert in their brief that the prayer of their amended complaint for money damages pertains only to the pendent state law claims. While not obvious from the face of their complaint, we accept their distinction for purposes of this appeal.

found that this policy would be furthered by permitting aggrieved individuals to maintain suit to enjoin deceptive practices which, if continued, would lead to completed purchases or sales giving rise to potential 10b–5 liability.

■ The narrow exception to the "purchaser-seller" rule announced in *Kahan* was thus designed to provide prophylactic relief in cases where no actual purchase or sale had been completed. It was not intended to supplant the traditional "purchaser-seller" limitation in cases, such as the present, involving a consummated illegal stock transaction. Nor was its application made automatic, as plaintiffs seem to suggest, upon a prayer for "equitable relief" as opposed to money damages. Rather, the application of the rule was restricted to those situations in which its preventative purpose could be achieved.

In the instant case both the alleged breach of the 1966 agreement and the illegal sale of Class A treasury stock occurred before the law suit was commenced. Unlike *Kahan*, the relief which plaintiffs sought, and which the district court granted, was not intended to enjoin defendants from a course of activities which, if permitted to continue, might lead to a future illegal purchase or sale, but rather was designed primarily to undo the effects of a completed illegal transaction. To the extent the relief granted is prospective, insofar as it prohibits the Class A shares from being voted until such time as they can be properly transferred to plaintiffs,[6] it is nonetheless incidental to the primary order rescinding the sale to defendants. Under these circumstances the preventative aspects of the *Kahan* rule would not be furthered by permitting plaintiffs to maintain this action. We therefore conclude that

plaintiffs lacked standing to sue for alleged violations of Rule 10b–5 on this alternative basis as well. Consequently, the judgment of the district court must be reversed and plaintiffs' 10b–5 claim dismissed.

## III. PENDENT STATE CLAIMS

In addition to their claims under the federal securities laws, plaintiffs' complaint charged defendants with state law breach of fiduciary duty, fraud, interference with contractual relations and violations of the New Jersey Securities Act. We must next consider whether the district court properly entertained those state law claims under the doctrine of pendent jurisdiction. See *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).[7]

Defendants argue that the power to exercise pendent jurisdiction is lacking where, as here, the federal claims are dismissable on the pleadings pursuant to a F.R.Civ.P., Rule 12 motion to dismiss. Even assuming the power to exercise jurisdiction over the state claims exists, they contend that the district court abused its discretion in entertaining the claims because they constituted "the real body of the case, to which the federal claim [was] only an appendage." *Gibbs, supra*, 383 U.S. at 727, 86 S.Ct. at 1140. Plaintiffs, on the other hand, argue that the district court properly exercised its discretion in retaining and deciding the state law claims since those claims arose out of the same series of transactions as the substantial federal claims and since a bifurcation of the state and federal claims would have been unjust and unfair.

■ Pendent jurisdiction is essentially a discretionary doctrine designed to permit a party to try in one judicial proceeding all claims arising out of a "common nucleus of

---

6. On plaintiffs' motion for a preliminary injunction, the district court ordered, *inter alia*, the appointment of an escrow agent to take possession of defendants' stock pending a final judgment on the merits. The defendants retained all incidents of ownership with the exception of the right to vote the stock. 337 F.Supp. 834 (D.N.J.1972). In its final judgment, the court ordered that none of the Class A shares held by the escrow agent were to be voted at the forth-

coming stockholders' meeting and that following the election of a new board of directors, the shares were to be retendered to Wakefern and then transferred to plaintiffs.

7. The latest Supreme Court discussion of *Gibbs*, albeit in a different context, is found in *Aldinger v. Howard*, —— U.S. ——, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).

operative fact," without regard to their federal or state character, where to do so would promote convenience and sound judicial administration. The *power* of the court to exercise pendent jurisdiction, though largely unrestricted, requires, at a minimum, a federal claim of sufficient substance to confer subject matter jurisdiction on the court. *Gibbs, supra*, 383 U.S. at 725, 86 S.Ct. 1130. The substantiality of the federal claim is ordinarily determined on the basis of the pleadings. If it appears that the federal claim is subject to dismissal under F.R.Civ.P. 12(b)(6) or could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, then the court should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances. *Kavit v. A. L. Stamm & Co.*, 491 F.2d 1176 (2d Cir. 1974). As the Second Circuit noted in *Kavit*,

> "this is essential to avoid a result where, as has been happily said, 'the dog would be wagged by his tail.' Hart & Wechsler, The Federal Courts and the Federal System 925 (2d ed. 1973)."

491 F.2d at 1180 (footnote omitted)

■ Applying these principles to the instant case, we believe that the pendent state claims should have been dismissed together with the federal claims. Plaintiffs' lack of standing to sue under Rule 10b–5 was a threshold bar which precluded them from stating in their complaint a cognizable claim for relief under the federal securities laws. As a consequence, their complaint could not have withstood a motion to dismiss for failure to state a claim under F.R. Civ.P. 12(b)(6). That this defense was raised in defendants' answer rather than by motion is of no moment. Under either alternative the absence of a substantial federal claim for relief should have been apparent on the basis of the pleadings at an early stage in the proceedings. Since there was no substantial federal claim to which the state claims could be appended, the primary justification for the exercise of pendent jurisdiction was absent. Accordingly, the state claims should have been dismissed. *See Knuth v. Erie-Crawford Dairy Coop. Ass'n*, 395 F.2d 420 (3d Cir. 1968); *Elberti v. Kunsman*, 376 F.2d 567 (3d Cir. 1967) (per curiam).

■ Nor can the court's exercise of jurisdiction be justified on the ground that "exceptional circumstances" were present which removed the case from an application of the general rule requiring dismissal. *See Kavit, supra*, 491 F.2d at 1180 n. 4. Notwithstanding the already substantial time devoted to the case and the expense incurred by the parties, we do not believe that the hallmark considerations of "judicial economy, convenience, and fairness to litigants" dictate that the pendent claims be entertained. It is indeed unfortunate that the case has progressed to the appellate level following a trial by the district court when it should have been dismissed on the pleadings for lack of standing. The fault, however, cannot be attributed to any lack of diligence on the part of the defendants who at all times during the proceedings have vigorously asserted their standing objections. Were we to sustain the district court's exercise of pendent jurisdiction merely because of the time already invested in litigating the state claims, we would be insulating from review a significant class of cases solely because an alleged error had been perpetuated through the trial process. The needless expenditure of time and energy occasioned in the first instance by the improper exercise of pendent jurisdiction would thus become the justification for allowing the incorrect ruling to stand. Absent other circumstances not present here, such as the invocation of a significant federal policy, we find this justification to be insufficient to sustain the district court's exercise of pendent jurisdiction.

We stress that our decision in no way prejudices the plaintiffs' legal rights since they may obtain a full adjudication of their state law claims in a pending state court proceeding[8] which was stayed, by agree-

---

8. The state court action is entitled *Wakefern Food Corp., etc., Plaintiff v. Foodarama Super-* *markets, Inc., etc., et al., Defendants,* and is currently pending in the Superior Court of New

ment among the parties, until a final judgment was rendered in the instant case. Indeed, in view of the substantial overlap between the state and federal claims, and the fact that even the subject matter of the federal claims has its genesis in state law, it would appear that the state forum is the preferable one to resolve the state issues raised and to obtain a "surer-footed reading of applicable law." *Gibbs, supra*, 383 U.S. at 726, 86 S.Ct. 1130.

The judgment of the district court will be reversed and the case remanded with directions for the district court to dismiss plaintiffs' complaint.

Jersey, Chancery Division, Union County, No. C–3893–70.