SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Jacob ADONI and Victor Douenias, Defendants.

No. CIV.A.97–350 (JAG).

United States District Court, D. New Jersey.

Aug. 31, 1999.

Mark Kreitman, Securities and Exchange Commission, Washington, DC, for Plaintiff.

Jonathon D. Warner, Warner & Joselson, New York City, for Defendants.

## OPINION

GREENAWAY, District Judge.

This matter comes before the Court on Defendant Victor Douenias' ("Defendant") motion to dismiss Count One of Plaintiff Securities and Exchange Commission's ("SEC") Complaint. The SEC has filed a motion for summary judgment seeking a ruling in its favor on all counts of the Complaint. The SEC also seeks to strike the affidavit of Defendant's attorney, Jonathon D. Warner, and portions of Defendant's affidavit submitted in opposition to the SEC's motion for summary judgment. This Court heard oral argument on January 25, 1999.[1] For the reasons discussed below, Defendant's motion to dismiss is granted and the SEC's motion for summary judgment is denied.

1. At oral argument, this Court denied the SEC's motion to strike the affidavits. This Court determined that it would be more appropriate to disregard those portions of the affidavits that were not factual recitations based on personal knowledge. The SEC's attorney, Mark Kreitman, agreed with this Court's determination. This Court will not discuss that motion in this Opinion because the reasons for the denial of the SEC's motion were fully set forth on the record. Thus, the two motions remaining for this Court's consideration are Defendant's motion to dismiss and the SEC's motion for summary judgment.

2. For purposes of this motion to dismiss, this court must accept as true the facts set forth in the SEC's Complaint and draw all inferences therefrom in the SEC's favor. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1391 (3d Cir.1994).

### *FACTS* [2]

*Background and SEC activity*

Defendant Jacob Adoni was the President, Chief Executive Officer, and a Director of the Simone Group, Inc. ("Simone"), a former Delaware corporation engaged in the shoe and handbag business.[3] Defendant Douenias, Adoni's brother-in-law, was the head of operations for Simone.[4] Simone purchased shoes from manufacturers and in turn sold them to customers under the brand name "L.J. Simone". Simone's securities were registered with the SEC pursuant to 12(g) of the Exchange Act and were traded on NASDAQ until July 16, 1990, when the stock was delisted.[5]

In December 1992, Simone filed with the SEC a registration statement proposing the issuance of a $2.7 million rights offering.[6] The SEC's Division of Corporation Finance raised substantial objections to the registration statement. As a result, the offering was delayed. The offering was eventually withdrawn due to accounting irregularities discovered during Simone's fiscal year end audit.

### *The Fraudulent Prebilling Scheme*

During all time periods relevant to the instant matter, Simone financed its operations through the services of a factor, Con-

3. On July 21, 1993, Simone filed for Chapter 11 bankruptcy protection. In January 1995, the Bankruptcy Court approved Simone's agreement with the Nine West Group to sell its assets and liabilities for $1.82 million. Upon the completion of this transaction, Simone ceased operations.

4. There is a dispute regarding whether Douenias was the "head of operations" at Simone, as the SEC argues, or whether he was truly an import manager, as Douenias himself argues.

5. The manner, reasons and effect of delisting are not relevant to the discussion herein.

6. Rights offering means "[t]he sale of new shares of common stock by distributing stock purchase rights to a firm's existing shareholders." Blacks's Law Dictionary 1326 (6th ed.1990).

gress Talcott ("Talcott"). Talcott loaned Simone money based on a percentage of the company's outstanding accounts receivable, as evidenced by invoices for goods that had been shipped to customers. Talcott provided Simone with a $14.5 million line of credit against which Simone could borrow, up to 80% percent from its eligible accounts receivable.

In the ordinary course of business, Simone generated invoices only after shipping merchandise in response to customer orders. Those invoices would then be submitted to Talcott to obtain financing. Around 1988 or 1989, according to Douenias, Simone had employed a computer system where the invoices were generated before the products were shipped. Talcott, upon learning of Simone's system, informed Simone that this constituted "prebilling" and it was not proper procedure.[7] Douenias was aware of that information.

During 1992, Simone experienced severe cashflow problems. By mid–1992, the company lacked sufficient funds, on several occasions, to secure the release of its inventory from its freight forwarder. Beginning in December 1992, Simone began prebilling again. Douenias directed Simone's employees to prepare the unshipped order invoices.[8] Douenias then kept those invoices in his office, in a separate file apart from the legitimate invoices that were generated at the time the goods were shipped to customers.

When the fraudulent invoices were printed at Simone, an entry was automatically made on the daily sales journal. The daily sales journal was generated by a clerk who worked for Douenias and who, on a daily basis, submitted the journal to Simone's accounting department. Consequently, the generation of the fraudulent invoices resulted in fraudulent misrepre-sentations in other corporate books and records, including Simone's daily sales journals, general ledger and accounts receivable ledger. The unshipped order invoices caused Simone's daily sales journals, the general ledger and the accounts receivable ledger to reflect approximately $1.2 million of sales revenue that was recognized as of January 31, 1993, for goods that had not yet been shipped.

When the accounting department added the fraudulently recorded sales to the general ledger, the sales were booked and recognized as revenue. At the January 31, 1993, fiscal year end, Simone's financial statements reflected approximately $1.2 million of improperly recognized revenue. Simone presented these financial statements to its auditors, KPMG, in connection with the 1993 fiscal year end audit.

In April 1993, while conducting revenue and sales-cutoff tests as part of its audit of Simone's 1993 fiscal year, KPMG discovered serious discrepancies between dates that appeared on Simone's fraudulently generated invoices and the company's shipping records. The auditors determined that Simone had recorded and recognized approximately $1.2 million of revenue from the fraudulent invoices, and questioned Adoni about them. Adoni admitted to KPMG's Supervising Auditor, Richard B. Grant, that the receivables purportedly represented by the fraudulent invoices were uncollectible and should be written off. KPMG resigned the audit engagement immediately thereafter, citing an inability to rely on the representations of management. Simone reported KPMG's resignation in a Form S–K filed with the SEC on May 5, 1993. At or around that same time, Simone withdrew its registration statement with the SEC for the public offering. Thereafter, the

**7.** It is unclear from Douenias' investigative testimony whether Talcott informed Simone that the practice was illegal or not proper accounting procedure. *See* Douenias Aff., Ex. D at 205–10. From his investigative testimony, it appears that Douenias was informed that the procedure was improper for Simone's relationship with Talcott, but not that it was illegal. *See id.*

**8.** It appears that the invoices represented goods that were never shipped to customers.

SEC launched an investigation into Simone's fraudulent bookkeeping.

The SEC instituted this action on January 21, 1997. The SEC charged Defendants with violations of Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934. The SEC's Complaint seeks civil penalties and an injunction prohibiting Defendants from committing future violations of the securities laws. Defendant Adoni settled with the SEC and this Court entered a Final Judgment and Order against him on October 29, 1997. Defendant Douenias remains in this case as the sole defendant.

## DISCUSSION

### Defendant's Motion to Dismiss Count One

Count One of the SEC's Complaint alleges that Defendant violated Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. Defendant asserts that Count One of the Complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

#### Standard for Motion to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) may be granted only, if accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to the Plaintiff, the Plaintiff is not entitled to relief. *See Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996); *Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir.1993). The complaint "must set forth sufficient information to suggest that there is some recognized legal theory upon which relief may be granted." *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1078 (D.C.Cir.1984). This Court may not dismiss the SEC's Complaint unless it can "prove no set of facts" that would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Graves v. Lowery*, 117 F.3d 723, 726 (3d Cir.1997).

#### Section 10(b) of the Exchange Act

Section 10(b) of the Exchange Act provides that:

It shall be unlawful for any person, directly or indirectly . . .

\*  \*  \*  \*  \*  \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C.A. § 78j. Rule 10b–5 promulgated thereunder provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange.

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1999). "The purpose underlying section 10(b) and the rules adopted under it is to insure that investors obtain disclosure of material facts in connection with their investment decisions regarding the purchase or sale of securities." *Angelastro v. Prudential–Bache Securities, Inc.*, 764 F.2d 939, 942 (3d Cir.1985), *cert. denied*, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985).

■ To establish a violation of Section 10(b) and Rule 10b–5, the SEC "must prove by a preponderance of the evidence all five of the following elements:" (1) a misrepresentation, or an omission (where there was a duty to speak), or other fraudulent device; (2) materiality in the case of a misrepresentation or omission; (3) in connection with the purchase or sale of a security; (4) scienter; and (5) the involvement of interstate commerce, the mails or a national securities exchange. *S.E.C. v. Jakubowski*, 912 F.Supp. 1073, 1079 (N.D.Ill.1996) (citations omitted); *see also Angelastro*, 764 F.2d at 942 n. 5. "The Supreme Court has declared that section 10(b) must be read 'flexibly, not technically and restrictively.'" *Angelastro*, 764 F.2d at 942 (quoting *Superintendent of Ins. v. Bankers Life and Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)).

Defendant argues that the SEC cannot show (1) that the alleged fraud was perpetrated in connection with the sale or purchase of any security and (2) that any public filing contained a misrepresentation. The SEC counters that its powers extend to the prevention of possible violations. Therefore, the SEC claims that the "fortuitous intervention" of the accountants thereby preventing the fraud from appearing in public records does not relieve Defendant of Section 10(b) liability.

*"In Connection With"*

■ "The leading Supreme Court case dealing with the 'connection' proviso of s 10(b) . . . is *Superintendent of Ins. v. Bankers Life and Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)." *Ketchum v. Green*, 557 F.2d 1022, 1026 (3d Cir.1977). The Supreme Court held that the "in connection with" language of the statute requires a determination whether the plaintiff has "suffered an injury as a result of deceptive practices touching [the purchase or] sale of securities." *Bankers Life*, 404 U.S. at 12–13, 92 S.Ct. 165. The Third Circuit has "construed the 'touching' requirement as mandating that there be some 'causal connection between the alleged fraud and the purchase or sale' of a

security." *Angelastro*, 764 F.2d at 943 (quoting *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 194 (3d Cir.1976)); *see also Ketchum v. Green*, 557 F.2d at 1028.

"Such an actionable causal nexus has been found where there was a churning of brokerage accounts, a broker failed to explain risks of trading on margin, an inducement was offered to tender stocks by false promise of future employment, and a broker-trainee was misrepresented to be a stockbroker and portfolio management specialist." *Gubitosi v. Zegeye*, 28 F.Supp.2d 298, 303–04 (E.D.Pa.1998) (citing *Costello v. Oppenheimer & Co.*, 711 F.2d 1361, 1368 (7th Cir.1983); *Thompson v. Smith Barney, Harris Upham & Co.*, 709 F.2d 1413 (11th Cir.1983); *McGrath v. Zenith Radio Corp.*, 651 F.2d 458 (7th Cir.), *cert. denied*, 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981); *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980); *In re Catanella and E.F. Hutton and Co.*, 583 F.Supp. 1388, 1405, 1410–11 (E.D.Pa.1984); *Steinberg v. Shearson Hayden Stone, Inc.*, 546 F.Supp. 699 (D.Del.1982), all cited in *Angelastro*, 764 F.2d at 943).

"[I]t seems clear from the legislative purpose Congress expressed in the Act, and the legislative history of Section 10(b) that Congress when it used the phrase 'in connection with the purchase or sale of any security' intended only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities." *Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). "Unlike private litigants seeking damages, the [SEC] is not required to prove that any investor actually relied on the misrepresentations or that the misrepresentations caused any investor to lose money." *Securities and Exchange Commission v. Blavin*, 760 F.2d 706, 711 (6th Cir.1985).

The SEC contends that Simone's practice of prematurely booking sales operated as a fraud under Section 10(b). The SEC further contends that those prematurely booked sales would have appeared in financial statements, upon which investors would have relied,[9] had KPMG not discovered the fraud. The SEC claims that Defendant is no less culpable for the fraud because KPMG uncovered the scheme before the company's financial statements were filed with the SEC and disseminated to investors and the market generally.[10] In support of that argument, the SEC relies on several cases. This Court finds those cases distinguishable from the instant case.

First, the SEC cites *Securities and Exchange Commission v. Rana Research, Inc.*, 1990 WL 267365 (C.D.Cal.1990), *aff'd*, 8 F.3d 1358 (9th Cir.1993).[11] In *Rana*, the Court held that the defendant's issuance of a press release announcing the fictitious acquisition of another company, coupled with the defendant's trading in the other company's stock thereafter, satisfied the "in connection" with requirement of Section 10(b). *Id.* at 21. There, the stock exchange stopped all trading in the affected company's stock once it became aware of the defendant's fraud, and did not reopen trading until after curative information had been released. *Id.* at 12. Thus, the defendant argued that no investor had traded the company's stock in reliance on the fictitious press release. *Id.* at 20.

The Court refused to accept the defendant's argument that "having proved that the defendant had taken all steps necessary to carry out the fraud under Rule 10b–5, and having shown that prospective injunctive relief was warranted, the SEC was nonetheless foreclosed from seeking such relief because fortuitously the defendant's fraudulent scheme failed." *Id.* at 21. The Ninth Circuit affirmed that decision, noting that defendant "intended to affect the market for [the other company's] stock". 8 F.3d at 1362.

*Rana* is distinguishable from this case. Here, the SEC does not allege in its Complaint that there was any dissemination, much less public dissemination, of the fraud by Simone. In fact, the SEC does not allege that any financial statements were ever compiled that included the prematurely booked sales. Further, the SEC does not allege that Defendant Douenias intended to affect the value of the company's stock.[12] In *Rana*, the defendants had taken all the necessary steps to encourage investor reliance on the fictitious press release. Here, the SEC has not alleged that Defendant had taken all of, or even most of, the steps necessary to commit a violation of Section 10(b).

The SEC also cites *Kuehnert v. Texstar Corp.*, 412 F.2d 700 (5th Cir.1969), in support of its argument that Defendant is liable for the fraudulent scheme. The *Kuehnert* Court held that a tippee, trading on fictitious inside information, was barred by the doctrine of *in pari delicto* from recovering against the corporate insider that provided the tippee with the fictitious information.[13] *Id.* at 704–05. In that case,

---

**9.** This Court notes that Defendant has not argued, and could not successfully argue, that reasonable investors do not rely on corporate financial statements.

**10.** The financial statements would have been filed with the SEC in connection with Simone's pending application for an initial offering. The company's application was withdrawn after the discovery of the fraud, but before any financial statements were compiled and officially submitted.

**11.** This case is not binding on this Court because it (1) originates from another Circuit and (2) is an unpublished Opinion. This Court, nonetheless, will consider the merits of the SEC's arguments.

**12.** Although Simone's stock was not traded on a public exchange because it had been delisted, there were still private shareholders, including Defendants Adoni and Douenias.

**13.** The terms tippee and tipper are legal terms of art applicable to the securities market. A tipper is known as a corporate insider that reveals inside corporate information to someone outside the company. The tippee is the person receiving the inside information that usually trades on the basis of that information.

the tippee, brought suit against the tipper when the tippee learned that the inside information on which he had relied when he executed his trades was fictitious, thereby causing him to lose significant sums of money. *Id.* at 702. The Court stated:

> [W]e are not convinced of any difference in substance between a successful fraud and an attempt. The statutory phrase "any manipulative or deceptive device," 15 U.S.C. § 78j(b), seems broad enough to encompass conduct irrespective of its outcome. The [SEC] may act . . . under 10(b), involved here, to enjoin a potential fraud or prosecute a fraud that failed, without proof of actual loss to any victim.

*Id.* at 704. The Court found it of no significance that the tippee did not actually trade on inside information because the information was false. *Id.* The Court concluded that the tippee was just as liable because of his intent, as if he had actually traded on inside information. *Id.* Thus, the Court refused to reward him for his failed attempt to violate the securities laws. *Id.* at 704–05.[14]

The SEC relies on the tipper-tippee line of cases merely for the discussion of tippee liability for the attempted, but unsuccessful, trading on inside information. This Court concludes that the findings of liability in those cases are distinguishable from this case. As in *Rana*, in the tipper-tippee line of cases, the tippees did everything necessary to effectuate insider trading, a clear violation of Section 10(b). The failure to consummate the violation resulted only from the fact that the information was false or inaccurate.

In this instance, the SEC does not allege in its Complaint that Defendant did everything necessary to constitute a violation of Section 10(b). The SEC does not allege that the fraudulent information appeared in any financial statements. The SEC does not allege that Defendant disseminated any financial documents containing fraudulent information upon which reasonable investors could or would rely. Further, the SEC does not allege that Defendant engaged in the scheme in an attempt to influence investors. The steps allegedly taken by Defendant are in no way akin to the completed acts of the tippees in the tipper-tippee line of cases.

The SEC seeks to expand Section 10(b) liability to instances in which the accused have not taken all the necessary steps for effectuating the fraud, or have been prevented from effectuating the fraud by an outside source. The attempted but failed fraud discussion by the Courts in *Rana* and *Kuehnert* occurred with respect to whether the SEC would need to prove actual reliance or trading on inside information, where it was clear that the defendant had taken all steps necessary to complete the fraud. Here, however, there was never even a remote possibility of reliance because Defendant had not taken all steps necessary to complete the fraud. This Court refuses to extend the reach of Section 10(b) as far as the SEC urges.

The Third Circuit cases construing the "in connection" requirement are instructive. In *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187 (3d Cir.1976), the Third Circuit considered whether the Class A shareholders of a corporation could bring suit against the Class C shareholders of the same corporation for violation of a written

14. The Third Circuit has followed the holding of *Kuehnert*. *See Tarasi v. Pittsburgh Nat'l Bank*, 555 F.2d 1152, 1159–61 (3d Cir.), *cert. denied*, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977); *Grumet v. Shearson/American Express, Inc.*, 564 F.Supp. 336, 340–41 (D.N.J. 1983). The Supreme Court has changed the landscape of *Kuehnert* and its progeny by determining that the defense of *in pari delicto* is not available in cases brought by a tippee against a tipper. *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). In *Berner*, however, the Supreme Court expressed no views on the question of Section 10(b) liability for attempted offenses and assumed for its purposes that the tippee was liable for the attempted trade on inside information. *Id.* at 311–12 n. 21, 105 S.Ct. 2622.

agreement in connection with the sale of corporation stock. There, the Class A shareholders had an agreement with the corporation granting them the right of first refusal should the corporation decide to re-issue Class A treasury shares. *Id.* at 190–91. The corporation subsequently denied the Class A shareholders the ability to exercise that right when it re-issued its Class A treasury shares. *Id.* at 191. The Class A shareholders brought suit against the corporation's board of directors and the Class C shareholders alleging violations of the securities laws. *Id.*

The District Court entered judgment in favor of the Class A shareholders. *Id.* The Third Circuit reversed, holding that the Class A shareholders "lacked standing to sue for alleged violations of Rule 10b–5." *Id.* at 195. The Court found that the causal connection between the alleged fraud and the purchase of securities was lacking. *Id.* at 194. The Court noted that "[t]he fraud which plaintiffs · have alleged lies not in the actual sale of stock to them, but rather in the refusal to sell the remaining Class A shares in accordance with the … agreement." *Id.* Thus, the Court held that Plaintiffs could not sue for a Section 10(b) violation because they could not establish fraud in connection with the purchase of securities. *Id.*

Similarly, in *Ketchum v. Green,* 557 F.2d 1022 (3d Cir.1977), the Third Circuit affirmed the District Court's dismissal of a Section 10(b) action where the plaintiffs could not establish fraud in connection with the purchase of securities. There, two former officers of a corporation sued the board of directors and other officers of the company for fraud in connection with their ouster. *Id.* at 1024. The plaintiffs brought a Section 10(b) action relying on the fact that, pursuant to the terms of a stock retirement agreement, their ouster required them to sell their shares of stock back to the company. *Id.* at 1023.

In affirming the District Court's dismissal of the plaintiffs' complaint, the Third Circuit noted that the case concerned "the application of § 10(b) to another category of activity-an internal struggle for control of a close corporation." *Id.* at 1025. The Court found that the Supreme Court's decision in *Bankers Life* should not be interpreted so broadly as to cover all disputes relating to intra-corporate management. *Id.* at 1027. "Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal. corporate mismanagement." *Id.* at 1027 (quoting *Bankers Life,* 404 U.S. at 12, 92 S.Ct. 165). "If the present action essentially involves an instance of internal corporate mismanagement, then it would appear that the 'touch' test of *Bankers Life* would not draw this lawsuit within the coverage of § 10(b)." *Id.* The Court concluded that the fraud had occurred "in connection with the struggle for control of the corporation". *Id.* at 1027–28. Thus, the Court held that the conflict constituted nothing more than internal corporate mismanagement. *Id.*

The Court further discussed the nexus between the fraud and the securities transaction. *Id.* at 1028. The Court found that the "supposed deception here is somewhat removed from the ultimate [securities] transaction." *Id.* The Court reasoned:

It is thus evident that the alleged misrepresentations on the part of the defendants were undertaken with the objective of inducing the expulsion of the plaintiffs as officers and employees not to foster the surrender of their stock. While it may be that the surrender of the shares will constitute a consequence of the defendants' overall scheme, we believe that such a consequence, at best, will be an indirect one. Accordingly, it would appear that the deceptive practices in which the defendants are alleged to have engaged and the ultimate sale of plaintiffs' stock are not tied sufficiently tightly so as to surmount the "connection" requirement of § 10(b), even as broadly formulated in *Bankers Life.*

*Id.* The Court also cautioned against the expansion of Section 10(b) to overlap general corporate laws. *Id.* at 1029.

The Third Circuit in *Tully* and *Ketchum* appeared to take the defendants' intent into consideration in deciding whether the "in connection with" proviso was satisfied. In *Tully,* the Court noted that the fraud was committed in the breach of the parties' contract and not with respect to the sale of securities. *Tully,* 540 F.2d at 194. Likewise in *Ketchum,* the Court noted that the fraud was "undertaken with the objective of inducing the expulsion of the plaintiffs as officers and employees not to foster the surrender of their stock." *Ketchum,* 557 F.2d at 1028. Here, according to the Complaint, the fraud was undertaken in an attempt to obtain additional credit from Simone's factor, and not in an attempt to affect the company's stock.

■ Furthermore, the Court in *Ketchum* was not persuaded by the fact that the ultimate result of the defendants' scheme would have been the forced sale of stock. The Court found this result to be, at best, an indirect one. *Id.* Thus, the Court found the ties between the fraud and the stock to be insufficient to warrant Section 10(b) liability. Similarly, this Court rejects the SEC's argument in favor of Defendant's liability based on the fact that the fraud could ultimately have reached financial statements that investors could possibly have relied on. This Court concludes that the fraud was too attenuated from any possible securities transaction to be actionable under Section 10(b).

Another Third Circuit case demonstrates the sort of causal connection generally required to satisfy the "in connection with" proviso. In *Angelastro,* the Court considered whether "alleged misrepresentations and non-disclosures by a brokerage firm regarding the credit terms of a margin account fall within the ambit of section 10(b)." 764 F.2d at 941. The plaintiffs sued the defendants for misrepresenting and failing "to disclose material information regarding the interest rates applicable to its margin accounts." *Id.* The District Court dismissed the plaintiffs' cause of action concluding that the activities complained of were not undertaken in connection with the sale or purchase of securities. *Id.* at 941–42. The Third Circuit reversed. *Id.* at 945–46.

The Court found that "[l]ike churning, concealment or misrepresentation of interest terms relating to a margin account does not affect the investment value of a particular security, but rather the course of dealing in securities." *Id.* at 944. The Court noted that, in order to avoid over expanding Section 10(b) liability, "courts should adopt a case-by-case approach for determining the proper scope of the 'in connection with' requirement." *Id.* at 945 (citing *Ketchum,* 557 F.2d at 1027). The Court noted that "[i]nvestors maintain margin accounts with brokerage firms for the very purpose of trading in securities." *Id.* at 944. Thus, the Court concluded that "[m]isrepresentation of the credit terms of a margin account . . . clearly meets the 'in connection with' requirements." *Id.* at 946.

In this instance, the causal nexus between Defendant's fraud and Simone's securities is insufficient to satisfy the "in connection with" proviso. This case is more analogous to *Tully* and *Ketchum* than to *Angelastro.* The fraud alleged here lies in Simone's attempts to obtain increased credit from its factor. There is no allegation that the fraud touched upon, or was in any way related to, the company's securities. Defendant's alleged fraud was well removed from any possible securities transaction. Third Circuit precedent and the allegations set forth in the Complaint mandate the conclusion that this case does not warrant Section 10(b) application. As noted by the Court in *Ketchum,* Section 10(b) should not be applied to combat every act of corporate fraud. Moreover, the most liberal readings of Section 10(b) have involved at least the opportunity for public reliance. In this case, however, there was no opportunity for public reliance.

The SEC maintains that the fraud could have reached the investing public had Simone's outside auditors not discovered the

problem. At oral argument, the SEC argued that public accountants are related to the regulatory arm of the SEC, and therefore, Defendant's fraud is not protected because KPMG detected it. This Court is not persuaded that public accountants are related to the regulatory arm of the SEC. The SEC has failed to offer any case law or other support for its position that public accountants should be treated as a regulatory arm of the SEC.

The SEC cannot analogize the intervention of outside auditors to the fortuitous failure of investors to rely on fraudulent information or the fortuitous outcome that inside information turns out to be false. The causal connection between fraud and securities is not consummated where auditors hired by the company prevent fraudulent information from reaching the investing public. In this case, the Defendant was prevented from completing the steps necessary to effectuate the fraud that could ultimately influence investors. On the other hand, the causal connection is clear where fraudulent information is disseminated, but the investing public fails to rely on that information. In that case, the defendant would have taken all steps necessary to influence investors, but the investors had simply failed to take the bait. In such a case, the defendant's intent and attempt to influence is evident.

The SEC's Complaint alleges that Defendant was responsible for Simone's practice of prematurely booking sales in order to obtain additional financing from Talcott. The allegations in the Complaint do not satisfy the "in connection with" proviso as set forth by the Third Circuit. The SEC's argument requires several unfinished steps to have occurred in order for Defendant's alleged fraud to have touched upon Simone's securities. The allegations in the Complaint appear to set forth an instance of internal corporate mismanagement by fraudulent bookkeeping, which is not actionable under Section 10(b). Thus, this

Court concludes that the SEC's Section 10(b) cause of action should be dismissed.

### SEC's Motion For Summary Judgment

The SEC seeks summary judgment on the remaining counts of its Complaint.[15] The SEC argues that no genuine issues as to material facts exist regarding Defendant's violation of Section 13(b)(5) of the Exchange Act and Rule 13b2–1 promulgated thereunder. The SEC contends that it is entitled to judgment as a matter of law. In opposition, Defendant argues that summary judgment at this stage of the litigation would be premature and that genuine issues as to material fact exist that preclude the grant of summary judgment.

Fed.R.Civ.P. 56(c) provides for summary judgment when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir.1996). Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and must instead present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130–31 (3d Cir.1995); *Sound Ship Bldg. Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.1976).

A genuine issue of material fact exists when a reasonable trier of fact could render a verdict for the non-moving party. *See Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1219 n. 3 (3d Cir.1988). In

---

**15.** This Court has dismissed Count One, Section 10(b) and Rule 10b–5, of the SEC's Complaint. The remaining two counts allege violations of Section 13(b)(5) of the Exchange Act and Rule 13b2–1 promulgated thereunder.

reviewing a motion for summary judgment, it is not the court's function to weigh the evidence, but rather to determine whether there is a genuine issue for trial. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. In determining whether there are any issues of material fact, the court must resolve all reasonable doubts as to the existence of a material fact against the moving party. *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir. 1972). Thus, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Carnegie Mellon Univ. v. Schwartz,* 105 F.3d 863, 865 (3d Cir.1997).

*Section 13(b)(5) and Rule 13b2–1*

Section 13(b)(5) of the Exchange Act provides:

No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2).

15 U.S.C.A. § 78m(b)(5). The "book, record, or account" described in Section 13(b)(2)(A) are those which "in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C.A. § 78m(b)(2)(A). Rule 13b2–1 promulgated pursuant to the Exchange Act provides:

No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities and Exchange Act.

17 C.F.R. § 240.13b2–1.

Relying on the sworn investigative deposition testimony of Defendant and Jacob Adoni given before SEC staff on June 1, 1995, the SEC contends that it is entitled to judgment as a matter of law. The SEC argues that Defendant admitted his liability in that deposition testimony and that Adoni's sworn testimony confirms Defendant's liability. This Court concludes that the grant of summary judgment would be premature in this instance.

*Rule 56(f)*

■ Federal Rules of Civil Procedure 56(f) provides that:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Defendant has submitted compelling reasons for this Court to deny the SEC's motion for summary judgment as premature.

First, Defendant has not answered the SEC's Complaint. Defendant filed a motion to dismiss in lieu of an answer. Second, Defendant has submitted an affidavit in opposition to the SEC's motion for summary judgment denying having violated Section 13(b)(5) and Rule 13b2–1. Although Defendant's investigative deposition testimony may contain certain admissions. Defendant's affidavit generally denies liability.[16] Third, Defendant's attorney, Jonathon D. Warner, has submitted an affidavit stating that he has been unable to obtain a statement from Jacob Adoni with respect to this matter:

Although the submission of an affidavit from Adoni denying his admission and explaining the origins of the A/R suspense account would create a genuine issue of material fact ... Douenias is presently unable to submit such an affidavit because of a consent and undertaking signed by Adoni stating that he would not "make any public statement denying, directly or indirectly, the allegations in the complaint." Accordingly, to obtain a sworn statement from Adoni denying his purported admission, Doue-

---

**16.** For example, Defendant admitted in his deposition that he was aware that Congress had informed Simone that prebilling was not

proper. *See* Defendant's Aff. Opp'n, Ex. D at 208–09.

nias must subpoena Adoni for a non-party deposition.

*See* Warner Aff. Opp'n at 2–3. Warner also argues that Defendant would like the opportunity to depose Simone's CFO, Sheldon, and employees of KPMG who conducted the audit of Simone.

In accordance with Rule 56(f), this Court concludes that Defendant should be permitted sufficient time to conduct discovery to obtain evidence relevant to his defense. It is apparent from the affidavits and the parties' other submissions that Defendant has not had adequate discovery. Thus, this Court denies the SEC's motion for summary judgment at this time.

### CONCLUSION

This Court grants Defendant's motion to dismiss Count One of the SEC's Complaint. The facts alleged in the Complaint are insufficient to support a cause of action for violation of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. The SEC's motion for summary judgment is denied at this time. This Court finds that the SEC's motion for summary judgment is premature.